In the Matter of the Judicial Settlement of the Account of Proceedings of ALICE M. METZ, as Administratrix with the Will Annexed of the Estate of HERMAN A. METZ, Deceased.*

BROADWAY TEMPLE CORPORATION, Claimant, Appellant; ALICE M. METZ, as Administratrix c. t. a., Respondent.

First Department, October 31, 1941.

* Revg. 173 Misc. 813.

*George J. Johnstone* of counsel [*Charles A. Frueauff* with him on the brief; *Frueauff, Burns, O'Brien & Ruch*, attorneys], for the appellant.

*William L. Hanaway* of counsel [*Edward A. Craighill, Jr.*, and *John L. Clark* with him on the brief; *Breed, Abbott & Morgan*, attorneys], for the respondent.

DORE, J.   In the latter part of 1928 Herman A. Metz, respondent's testator, signed and delivered a charitable subscription for $10,000 to appellant Broadway Temple Corporation, payable in two installments.   Mr. Metz during his lifetime paid the first installment of $5,000.   The administratrix *c. t. a.* rejected a claim made for the remaining installment of $5,000, unpaid at the testator's death on May 17, 1934.   The surrogate after a hearing sustained the rejection on the ground of frustration of the purposes the parties had in view when the promise was originally made. Appellant contends that the charitable subscription became a binding obligation, that there has been no frustration of the purpose.

The Broadway Temple Corporation in 1925 planned to erect on Broadway between One Hundred and Seventy-third and One Hundred and Seventy-fourth streets, Manhattan, an edifice to be known as the Broadway Temple.   The project was an ambitious one including a twelve-story apartment house on each corner and in the center an enormous tower, the first five floors of which were to contain the auditorium of the church and the upper floors hundreds of apartments.   The plans also provided for bowling alleys, gymnasium, social hall, Sunday school, and meeting rooms. The group of buildings was to be operated as a unit in the hope that revenue would be derived from the real estate, the net income of which was to be used for the religious, charitable and social activities of the Temple.

The first money raising campaign took place in 1925.   Through private contributions, the sale of $2,000,000 of second mortgage bonds and the money raised by a first mortgage, the two apartment buildings and the foundations of the central structure were constructed in 1926 and 1927, when it was discovered the buildings would cost $6,000,000 instead of $4,000,000.

In 1928 a campaign for an additional $1,500,000 in the form of gifts was initiated.   Pledges for that amount were secured, including the $10,000 pledge of decedent.   That pledge read as follows: " In consideration of my interest in the Broadway Temple Building and the type of service it will offer to the community and in consideration of the united efforts of others to raise funds to complete the building now in course of construction on Broad-

way at 173rd and 174th Streets, New York City, I hereby pledge and will pay to the Broadway Temple Corporation the sum of Ten Thousand Dollars." Decedent at the bottom of the pledge card wrote, " Will make it in two payments."

The pledge is undated but it was made late in 1928 and Mr. Metz paid the first half on October 17, 1929. At or about the same time in October, 1929, the Kennedy Construction Company, the contractors, had resumed work on the uncompleted building. That work consisted of completing an auditorium in the basement of the central building, the foundation and rough interior of which had been completed with the money originally raised, finishing walls and ceilings, Sunday school rooms and other rooms in connection with church and social work, and completing bowling alleys and a gymnasium in the basement. That renewed construction work, begun in the latter part of 1929, was continued into the spring of 1930. After a quarter of a million dollars or more had been expended, work was again stopped because of shortage of funds due to the failure of pledgors to pay the full amount of their pledges and to the intervening depression.

In December, 1929, while the construction work was still in progress, the church congregation moved into the basement of the building to carry on religious services and the various activities of the Temple. The congregation has ever since been holding such religious services in the basement, and the gymnasium, bowling alleys, social halls and other rooms are in use.

The representative of the estate contends that the use of the moneys collected in the second campaign to fit up the basement to include a social hall, bowling alleys, gymnasium, kitchen and what she calls a " makeshift chapel " was a diversion of the funds pledged to uses not contemplated by the parties when the pledge was made; that the act for which the promise was given was the completion of the great central tower housing a large church and 300 apartments from which the church would derive revenue, and the performance which occurred, viz., the outfitting of the basement, was not such act; and that finally the subsequent work was not done in reliance on the unpaid pledge but solely in reliance on the $600,000 collected when it became evident that the balance of the $1,500,000 was uncollectible.

The first answer to such contention is that the social hall, bowling alleys, gymnasium, kitchen, etc., were all part of the original plan which provided for construction thereof in the basement. The contractor's testimony, that the basement space that was completed was originally designated as part of the church planning, is uncontradicted.

Secondly, the pledge expressly recites that it was given in consideration of the pledgor's interest in the Broadway Temple " and the type of service it will offer to the community and in consideration of the united efforts of others to raise funds to complete the building now in course of construction." Completing the basement of the building and using it for the social, religious and charitable purposes of the Temple clearly constituted no diversion of the funds but use of them to render the community the type of service in consideration of which the pledge was given, even though because of defaults on the part of pledgors it was impossible at the time to complete the entire structure.

While it was planned to complete the rest of the central structure, including the originally planned church auditorium, above the street level, only the portion below the street level was finished. Apparently, however, the project had not been abandoned and regular religious services are being held in the basement auditorium used as a church and the other activities of the Temple are functioning.

It has been repeatedly held that charitable contributions are enforcible obligations constituting an offer of a unilateral contract which, when accepted by the charity incurring liability in reliance thereon, becomes a binding obligation. (*I. & I. Holding Corp.* v. *Gainsburg,* 276 N. Y. 427; *Keuka College* v. *Ray,* 167 id. 96; *Allegheny College* v. *National Chautauqua County Bank,* 246 id. 369.)

The record shows that after receipt of the Metz pledge and in reliance thereon work on the then uncompleted buildings was resumed and the basement in the central building was finished for use as church, social and charitable center. The gymnasium, bowling alleys, kitchen and other rooms were built and equipped.

The pledge was made about the end of the year 1928. The contractor testified he resumed construction work in October, 1929. The first half of the pledge was paid by Mr. Metz at that very time. The pledge was not given as a part of the first or original money raising campaign but as a part of the second. Mr. Metz was on the general committee which arranged the project, was a friend of the pastor, and regularly contributed every year to the church. He lived until May, 1934. It is fair to infer that he knew during his lifetime the original program could not be financed on the original basis, and that when he paid the first half of his pledge or at least long before his death, he knew the auditorium was constructed and used for church and other Temple activities in the basement instead of above the street level as originally planned. Although he lived for four years after the basement reconstruction had ended, he never revoked the balance of the pledge.

We think the evidence does not establish total abandonment or frustration of the project. The authorities cited by the surrogate are distinguishable, involving mercantile and commercial transactions in which some outside act or influence terminated the contract by destroying its foundation for all practical purposes. The subscription herein was the offer of a unilateral contract accepted by appellant when it resumed the work on the buildings and incurred obligations in reliance on this and other pledges. While the central building has not been completed as originally planned, there has been no such complete frustration of the project as contemplated by the parties when the pledge was given and the first half paid as to relieve respondent of liability for completing the subscription.

The decree so far as appealed from should be reversed, with costs, and the claim against the estate allowed.

MARTIN, P. J., GLENNON and UNTERMYER, JJ., concur; CALLAHAN, J., dissents.

Decree, so far as appealed from, reversed, with costs, and the claim against the estate allowed. Settle order on notice.