In the Matter of Lee BURRELL, Emma Burrell d/b/a Florida Van Center d/b/a B & L Van Unlimited, Inc., Debtors.

Ernest V. HARRIS, Plaintiff,

v.

Lee Roy BURRELL, Emma Burrell
and Lisa Burrell Agnew,
Trustee, Defendants.

In the Matter of Lee BURRELL, Emma Burrell d/b/a Florida Van Center d/b/a B & L Van Unlimited, Inc., Debtors. (Two Cases)

Betty CORNETT and Tim
Cornett, Plaintiffs,

v.

Lee BURRELL, Emma Burrell, Florida Van Center and B & L Van Unlimited, Inc., Defendants. (Two Cases)

Bankruptcy No. 92–30028.
Adv. Nos. 92–3012, 92–3027 and 92–3028.

United States Bankruptcy Court,
M.D. Georgia,
Athens Division.

Oct. 6, 1993.

Thomas H. Rogers, Jr., Athens, GA, for Betty Cornett and Tim Cornett.

Brian S. Carney, Athens, GA, for Lee Roy Burrell and Emma Burrell.

John Jay McArthur, Athens, GA, for Lisa Burrell Agnew.

Ernest V. Harris, Athens, GA, trustee.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

Lee Burrell and Emma Burrell, d/b/a B & L Van Unlimited, Inc., and d/b/a Florida Van Center, Inc., Debtors, filed a petition under Chapter 7 of the Bankruptcy Code on January 7, 1992. Ernest V. Harris, Chapter 7 Trustee, filed a "Complaint to Set Aside a Fraudulent Transfer and to Sell Property Pursuant to 11 U.S.C. § 363(h)" on February 20, 1992. Debtors and Lisa Burrell Agnew, Defendants, filed their answer on March 25, 1992. Trustee was allowed to amend his complaint on June 9, 1992, and on January 25, 1993. Betty Cor-

nett and Timothy Cornett filed an "Objection to Discharge" and a "Complaint to Determine Dischargeability of a Debt" on April 3, 1992. Debtors filed their answers on May 7, 1992. The three adversary proceedings were consolidated for trial. A trial was held on June 22, 1993. The Court, having considered the evidence presented, the stipulations of facts, and the arguments and briefs of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

The Burrell Homeplace ("the Homeplace") is a two-acre parcel of land in Oconee County, Georgia. The Homeplace has been owned by members of the Burrell family since 1946. Mr. Burrell and his siblings [1] conveyed their interest in the Homeplace to their mother, Gladys M. Burrell Head, by warranty deed dated March 31, 1969.

Mrs. Head conveyed the Homeplace to her granddaughter, Lisa Burretta,[2] by warranty deed dated June 3, 1970. Mrs. Burretta was one or two years old at the time of the conveyance.[3] She was, at that time, the only child of Lee and Emma Burrell (the "Burrells").

In 1984, the Burrells opened a van conversion business known as B & L Van Unlimited, Inc. They borrowed $10,000 from Betty and Timothy Cornett (the "Cornetts") to finance the business. As security for the loan, the Cornetts held the Manufacturer's Statement of Origin (MSO) on vans purchased by B & L Van. The Cornetts had known the Burrells for a number of years. They were friends and attended the same church.

Mr. Burrell decided to obtain additional financing for B & L Van from Citizens Banking Company. The bank's president offered to make a loan if Mrs. Burretta would convey the Homeplace to Mr. Bur-

---

1. Mr. Burrell and his siblings received an interest in the Homeplace through their father's estate.

2. Mrs. Burretta was formerly known as Lisa Fran Burrell and as Lisa Agnew. The Court will refer to her as Mrs. Burretta in this opinion.

3. Mrs. Burretta was 24 years old at the time of the trial in June of 1993.

rell. The Homeplace was to serve as collateral for the loan. Mrs. Burretta was fifteen years old and thus a minor under state law.[4] The bank president made the arrangements for the conveyance. Mrs. Burretta executed a warranty deed in the office of the probate judge in August of 1984, conveying the Homeplace to Mr. Burrell. The face of the deed shows that no real estate transfer tax was paid. This is evidence that the conveyance was without monetary consideration. Although Mrs. Burretta was a minor, a legal guardian was not appointed for her.[5] The Court is persuaded that Mrs. Burretta understood that she was conveying the Homeplace to her father.

Mr. Burrell obtained a loan in the amount of $80,000 from Citizens Banking Company. He executed a deed to secure debt dated September 1, 1984, conveying the Homeplace to the bank as collateral for the loan. Mr. Burrell later repaid this loan, and the deed to secure debt was cancelled in October of 1990.

The Burrells' business, B & L Van, purchased vans from manufacturers and dealers. The business customized the vans by installing special seats, roofs, and other features. B & L Van sold the conversion vans to retailers. Mrs. Burrell managed the day-to-day operations of B & L Van, and Mr. Burrell traveled, selling conversion vans to retailers. The average wholesale price of a conversion van was $20,000. B & L Van's average profit was $400 to $500 per conversion van.

The Cornetts continued to extend loans to the Burrells. The Burrells would offer to pay the interest when due, but the Cornetts would decline payment. The practice was to roll over the principal and interest into a new promissory note.

In 1987, the Cornetts sold their cemetery business and had some "extra" funds. In January of 1987, the Cornetts issued two checks for $125,000 each to B & L Van.

The Burrells executed a promissory note in the amount of $250,000 in February of 1987. The debt was to be paid one year later. This debt was, however, "rolled over" a number of times with the interest being added to the principal.

The Burrells opened a second van business in 1988. This business was known as Florida Van Center, Inc. The business sold vans to consumers. B & L Van sold about fifty percent of the vans it converted to Florida Van Center. Florida Van Center purchased eighty to ninety percent of its vans from B & L Van. The Burrells hired a general manager to handle the day-to-day operations of Florida Van Center.

The Burrells' businesses were successful until the summer or fall of 1990. The Persian Gulf war and the poor economy caused a significant decrease in van sales. At one time, B & L Van produced twenty conversion vans each week. During 1991, it produced only one to four conversion vans each week.

The Cornetts contend the Burrells obtained the renewal of two promissory notes through false pretenses, false representations, or actual fraud.

On February 5, 1991, the Burrells, on behalf of B & L Van, executed a promissory note in favor of the Cornetts. This was a renewal of a promissory note that had been executed in February of 1990. The debt was to be paid on February 5, 1992. The amount of the payment, including interest of fifteen percent, was $390,800. Mrs. Burrell, on behalf of B & L Van, issued a postdated check dated February 5, 1992, which when negotiated would pay the debt. The Burrells executed personal guarantees. The Burrells came to the Cornetts' home to execute the February 1991 promissory note. The Burrells represented that their businesses were doing fine and that "we're still rolling vans out." The Burrells represented that business was going just like normal. There was no discus-

---

**4.** Mrs. Burretta was not married and was living with her parents, the Burrells, in 1984.

**5.** Mr. Burrell was appointed as guardian for Mrs. Burretta in 1979 in a real estate transac-

tion not directly related to the transaction at issue. The evidence does not show that Mr. Burrell had authority to act as Mrs. Burretta's guardian in the transaction at issue.

sion on how many vans were being sold or whether the businesses were profitable. The Cornetts were not aware that B & L Van's sales had dropped from $6.7 million in 1989 to $3 million in 1990 or that Florida Van Center was losing money. The Cornetts repeatedly testified at trial that they trusted the Burrells and relied on their word to repay the loans.

The Burrells, on behalf of B & L Van, executed a second promissory note in favor of the Cornetts. This was a renewal of a promissory note that had been executed in August of 1990. Although the promissory note was dated August 5, 1991, it was actually signed on September 8, 1991. The debt was to be paid on August 5, 1992. The amount of the payment, including interest of fifteen percent, was $420,110. Mrs. Burrell, on behalf of B & L Van, executed a postdated check dated August 5, 1992, which when negotiated would pay the debt. The Burrells executed personal guarantees.

Mrs. Burrell contacted Wendell Dawson, attorney at law, in June of 1991. Mr. Dawson is related by marriage to the Burrells and is somewhat aware of their family and business affairs. Mrs. Burrell was concerned that new federal regulations on customized vans would increase the potential liability for the van businesses. These regulations were scheduled to become effective September 1, 1991. The van businesses were incorporated and carried liability insurance in the amount of $1 million. The Court is persuaded, however, that Mrs. Burrell was concerned that their personal assets were at risk. The Burrells were concerned about the three families that lived in mobile homes on the Homeplace; namely, (1) Mr. Burrell's elderly mother and her husband, (2) Mrs. Burretta and her husband and daughter, and (3) the Burrells' adult disabled son and his wife and son. The Burrells wanted these family members to have a place to live.

Mr. Dawson first suggested that the Burrells transfer their real property to Mrs. Burretta, who now was twenty-two years old. Mrs. Burretta and her husband,

Dale Angew, however, were having marital problems.[6] The Burrells also had a second child, Laura Burrell, who was eleven years old. The Burrells wanted to provide for her. Mr. Dawson suggested that a trust be established. Mrs. Burrell did not discuss the Burrells' debt situation with Mr. Dawson. Mr. Dawson prepared the necessary trust documents.

The Burrells executed a "Trust Agreement" dated July 16, 1991. Their daughters, Mrs. Burretta and Laura Burrell, are the beneficiaries of the irrevocable, spendthrift trust. Mrs. Burretta is the trustee. Mrs. Burretta and Laura Burrell did not pay any consideration for the trust. Mr. Burrell executed a deed dated July 16, 1991, conveying the Homeplace to Mrs. Burretta as trustee. Mr. and Mrs. Burrell executed a deed dated July 16, 1991, conveying their property in Hart County, Georgia, to Mrs. Burretta as trustee. Neither the Homeplace nor the Hart County property was encumbered by any lien. The Homeplace had an "adjusted tax value" of $170,000 in 1991. The Hart County property had a "tax value" of $117,620 in 1991. The Burrells' residence is located on the Hart County property. They continued to live in the residence with their daughter, Laura Burrell. They paid rent of $350 per month to the trust for two or three months until they became financially unable to pay rent.

During the summer of 1991, the Cornetts went on a church mission to Bulgaria. After they returned, Mrs. Cornett went to Epcot in Florida during the third week in August of 1991. The general manager of Florida Van Center had quit, and Mr. Burrell was handling the day-to-day operations. Mrs. Cornett visited with Mr. Burrell at Florida Van Center. Mr. Burrell represented that business was good. Mr. Burrell gave no indication that Florida Van Center was losing money. Mr. Burrell was not familiar with office procedures and equipment and was not able to operate the business. The Burrells wanted to keep Florida Van Center open until at least the end of 1991. They were unable to do so, and the

---

**6.** Mrs. Burretta and Mr. Agnew were divorced in February of 1992.

Burrells closed Florida Van Center on or around September 1, 1991. This was about one week after Mrs. Cornett's visit.

The Cornetts made a visit to B & L Van in August of 1991. They saw no vans on the lot and were concerned. Mrs. Burrell told them that Ford Motor Company was changing van models. That made sense to the Cornetts because "we completely trusted them." Mrs. Burrell had ordered two hundred new vans. About ten vans were actually delivered.

When the August 1991 promissory note was signed, the Burrells did not tell the Cornetts about the trust, which had been established in July of 1991. The Cornetts were not told that Florida Van Center had closed. Mr. Cornett testified that they would not have made the renewals in February or August of 1991 if they had known of the Burrells' financial problems. The Cornetts never requested nor received financial statements from the Burrells, B & L Van or Florida Van Center. The Cornetts relied upon their friendship and trust in the Burrells.

The Cornetts wanted to establish a Bible school in Bulgaria. They decided to use the funds that they had been loaning the Burrells for this purpose. Mrs. Cornett told the Burrells that they wanted to be paid when the February 5, 1991, promissory note came due in February of 1992. Mrs. Burrell said "OK." This conversation occurred sometime between December 25 and 31, 1991.

The Burrells closed B & L Van in January of 1992. The Burrells filed their bankruptcy case on January 7, 1992, to stop a foreclosure on their Florida Van Center property by Hubert Denson.

Mrs. Burretta worked for her parents at B & L Van. The Court is persuaded that Mrs. Burretta knew of B & L Van's financial problems when the trust was created. She contends she first became aware that she had once owned the Homeplace when the trust was established. The Court, however, has determined that she understood that she was conveying the Homeplace to her father in August of 1984. Mrs. Burretta became eighteen years of age in 1987. She has not filed an action to try to void the 1984 transfer of the Homeplace to her father. Neither of the Burrells nor Mrs. Burretta completed high school.

After the transfer of real property to the trust, the Burrells had no substantial equity in any property. Substantial debts were owed on the real property owned by B & L Van and Florida Van Center. The businesses owed other creditors. The Burrells had personally guaranteed some of these debts. The Court can only conclude that the Burrells were or became insolvent on the date of the transfers to Mrs. Burretta as trustee. The Cornetts first learned of the trust when the Burrells filed their bankruptcy case.

The Burrells planned to sell van seats through B & L Van to other van conversion companies. The Burrells received safety certification in October or November of 1991, for the seats they planned to sell. The Burrells contend that this shows they intended to continue to operate B & L Van after the Trust Agreement was executed.

In the fall of 1991, the Burrells renewed their insurance policies on the property at B & L Van and Florida Van Center. They also renewed their insurance for general liability, workers compensation, and accident, life, and hospitalization for employees. The Burrells continued to pay creditors as late as January 2, 1992. Mrs. Burrell testified that they did not intend to file bankruptcy when these payments were made. Mrs. Burrell asserts that this demonstrated they intended to continue operating the business. After the bankruptcy case was filed in January of 1992, the Burrells cancelled their insurance and received refunds.

A number of income tax returns were admitted into evidence. The tax returns for B & L Van and Florida Van Center reflect the following:

|  |  | B & L Van | Fla Van Center |  |
|---|---|---|---|---|
| 1989 | Gross Sales | $6,686,622[7] | $ 741,400 |  |
|  | Taxable Income | 131,793 | (363,913) |  |
| 1990 | Gross Sales | $3,029,328 | $4,311,505 |  |
|  | Taxable Income | (862) | (665,605) |  |
| 1991 | Gross Sales | $ 831,703 | Tax Return |  |
|  | Taxable Income | 14,894 | Not Available |  |

Mrs. Burrell testified that Florida Van Center had a taxable loss of $308,000 in 1991. This business closed in September of 1991. The Burrells testified that they cannot locate a copy of the 1991 tax return for Florida Van Center.

### CONCLUSIONS OF LAW

Trustee seeks to avoid as fraudulent conveyances the transfers of real property by the Burrells to Mrs. Burretta, as trustee. Section 548(a) of the Bankruptcy Code[8] provides:

**§ 548. Fraudulent transfers and obligations**

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C.A. § 548(a) (West 1993).

Trustee bears the burden of proving all facts necessary to prove that a fraudulent conveyance occurred. *Harris v. Huff (In re Huff)*, 160 B.R. 256 (Bankr.M.D.Ga. 1993).

The Homeplace and the Hart County property were transferred to Mrs. Burretta, as trustee, on July 16, 1991. The Burrells filed their bankruptcy case on January 7, 1992. It is clear that the transfers were made within one year before the bankruptcy case was filed.

The Burrells received no monetary consideration for the transfers. They wanted to protect the family members that lived on the Homeplace. They were concerned that their personal assets were at risk because of new federal regulations on customized vans. Love and affection is not reasonably equivalent value under section 548. *Walker v. Treadwell (In re Treadwell)*, 699 F.2d 1050, 1051 (11th Cir.1983). The Court is persuaded that the Burrells did not receive reasonably equivalent value in exchange for the transfers.

The Burrells owed substantial debts at the time of the transfers. They had executed personal guarantees of the debts

---

7. Mrs. Burrell testified that actual gross sales were about $500,000 less than as reflected on the tax return.

8. 11 U.S.C.A. § 548(a) (West 1993).

their van businesses owed to the Cornetts, which totaled around $800,000. The real property conveyed to Mrs. Burretta as trustee had a tax value of $287,620 and was not encumbered by any liens. The Burrells had no substantial equity in any other property. The Burrells were or became insolvent on the date the transfers were made. The Court is persuaded that Trustee may avoid the transfers under section 548(a).

Mrs. Burretta contends the conveyance of the Homeplace was not a transfer because she was the true owner of the Homeplace. Mrs. Burretta was a minor when she conveyed the Homeplace to her father in 1984. A legal guardian was not appointed to represent her interest.

■ A deed by a minor is voidable, and the minor may void the deed upon arrival at the age of majority, which is eighteen years of age. O.C.G.A. § 44–5–41 (1991); 1972 Ga.Laws p. 193 § 10. A minor must disaffirm a deed within a reasonable time after reaching majority. *Merritt v. Jowers*, 184 Ga. 762, 193 S.E. 238 (1937) (what is a reasonable time will depend upon facts of particular case, but will not be longer than seven years after reaching majority).

■ Mrs. Burretta reached the age of majority some six years ago. The Court has determined that Mrs. Burretta understood that she was conveying the Homeplace to her father in 1984, some nine years ago. Mrs. Burretta benefited from the conveyance because B & L Van provided her with employment for a number of years. The Court is persuaded that Mrs. Burretta failed to try to void the transfer to her father within a reasonable time after reaching majority.

Trustee asks the Court to authorize the sale of the Homeplace and the Hart County property under section 363(h) of the Bankruptcy Code.[9] Evidence on this issue was not presented at trial, and the Court need not address it in this memorandum opinion. *See Community National Bank and Trust Co. of New York v. Persky (In re*

*Persky)*, 893 F.2d 15 (2d Cir.1989); *Ray v. Ray (In re Ray)*, 73 B.R. 544 (Bankr. M.D.Ga.1987).

The Court now turns to the Cornetts' contention that the Burrells' discharge should be barred under several subsections of section 727(a) of the Bankruptcy Code.[10] The subsections at issue provide:

**§ 727. Discharge**

(a) The court shall grant the debtor a discharge, unless—

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

. . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . . .

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this para-

---

9.  11 U.S.C.A. § 363(h) (West 1993).

10.  11 U.S.C.A. § 727(a) (West 1993).

graph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify;

11 U.S.C.A. § 727(a)(2)(A), (3), (4)(A) and (D), (5), and (6)(A) (West 1993).

First, the Cornetts contend the Burrells intended to hinder, delay or defraud creditors by transferring the Homeplace and the Hart County property within one year before the bankruptcy case was filed. There is no dispute that the transfers took place within one year. The question is whether the Burrells intended to hinder, delay or defraud creditors.

In *Pavy v. Chastant (In re Chastant),*[11] the Fifth Circuit Court of Appeals stated:

The specific purpose of § 727(a)(2)(A) is to deny a discharge to those debtors who, intending to defraud, transfer property which would have become property of the bankruptcy estate. In order to deny discharge, the statute requires that four elements be proven: (1) a transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate. In the instant case, all elements have been stipulated except for the intent element.

The trustee bears the burden of establishing that the transfer occurred with the intent to hinder, delay, or defraud. 873 F.2d at 90–91.

■ The intent to hinder must be actual intent. Actual intent may be inferred from the actions of the debtor and usually must be proven by circumstantial evidence. *Future Time, Inc. v. Yates,* 26 B.R. 1006 (M.D.Ga.), *aff'd mem.,* 712 F.2d 1417 (11th Cir.1983). "Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case." *Devers v. Bank of Sheridan, Montana (In re Devers),* 759 F.2d 751, 754 (9th Cir.1985).

■ Courts have developed "badges of fraud" to help establish the requisite actual intent to defraud. The badges of fraud include:

1. the lack or inadequacy of consideration;

2. the family, friendship or close associate relationship between the parties;

3. the retention of possession, benefit or use of the property in question;

4. the financial condition of the party sought to be charged both before and after the transaction;

5. the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

6. the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582–83 (2d Cir.1983); *see also In re Chastant,* 873 F.2d at 91.

■ The Burrells transferred their only unencumbered property to their daughter, Mrs. Burretta, as trustee of an irrevocable, spendthrift trust. The trust was for the benefit of the Burrells' daughters, and the Burrells retained the use and enjoyment of part of the property, namely, their personal residence. The Burrells were or became insolvent on the date of the transfers and received no consideration.

"When [the Burrells] transferred [their] interest in the [real property] to [the trust, they] obviously intended to shield what [they] thought was valuable property from the claim of [their creditors]." *Davis v. Davis (In re Davis),* 911 F.2d 560, 562 (11th Cir.1990) (quoting *Future Time, Inc.,* 26 B.R. at 1009).

The Court, having considered the evidence presented, is persuaded that the Burrells intended to hinder, delay, or defraud creditors by transferring the Homeplace

11. 873 F.2d 89 (5th Cir.1989).

and the Hart County property. The Burrells, therefore, must be denied their discharge in this Chapter 7 case under section 727(a)(2)(A) of the Bankruptcy Code.

The Court, having determined that discharge must be denied under section 727(a)(2)(A), need not address the Cornetts' contention that discharge should be denied under other sections of 727(a) or that the Burrells obtained the renewal of loans through false pretenses, false representations, or actual fraud.[12]

The Court also need not address the Burrells contention that the Cornetts charged compound interest in violation of Georgia law.

An order in accordance with this memorandum opinion will be entered this date.

### ORDER

In accordance with the memorandum opinion entered this date; it is

ORDERED that the conveyance on the 16th day of July, 1991, of the following described property by Lee Roy Burrell to Lisa Burrell Agnew, Trustee of the Lisa Burrell Agnew and Laura Lee Burrell Trust dated July 16, 1991, hereby is set aside as null and void:

> All that lot or parcel of land containing 2.0 acres, more or less, situate, lying and being on U.S. Highway 78, two miles south of Bogart, in the 240th District, G.M., Oconee County, Georgia; said property being bounded now or formerly and generally as follows: northerly by said highway, easterly by lands of James

Crow, southerly and westerly by lands of Perrie L. Brantley.

and it is further

ORDERED that the conveyance on the 16th day of July, 1991, of the following described property by Lee R. Burrell and Emma F. Burrell to Lisa Burrell Agnew, Trustee of the Lisa Burrell Agnew and Laura Lee Burrell Trust dated July 16, 1991, hereby is set aside as null and void:

> All that lot or parcel of land, together with all improvements thereon, situate, lying and being in the 1119th District, G.M., Hart County, Georgia, designated as Lot No. Three (3) on a plat made by A.M. Britt, Registered Land Surveyor, dated September 1, 1967, recorded at Plat Book 2, page 129, in the office of the Clerk of Superior Court of Hart County, Georgia, which plat and the recordation thereof is by reference incorporated herein in aid of this description.

and it is further

ORDERED that the discharge of Lee Burrell and Emma Burrell, d/b/a Florida Van Center, d/b/a B & L Van Unlimited, Inc., Debtors, under Chapter 7 of the Bankruptcy Code hereby is denied.

SO ORDERED.

---

12.  11 U.S.C.A. § 523(a)(2)(A) (West 1993).