In re 375 PARK AVENUE ASSOCIATES,
INC., et al., Debtors.

Bankruptcy Nos. 93–B–42011(CB), 93–
B–42012(CB) and 93–B–41600(CB).

United States Bankruptcy Court,
S.D. New York.

June 9, 1995.

Wachtell, Lipton, Rosen & Katz by David C. Bryan, New York City, for Plan Committee.

Arent Fox Klintner Plintner Plotkin & Kahn, by Jill R. Newman, David N. Wynn, New York City and Washington, DC, for U.S. Holocaust Council.

## MEMORANDUM DECISION ON MOTION OF THE UNITED STATES HOLO-CAUST MEMORIAL COUNCIL FOR SUMMARY JUDGMENT

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

The Liquidating Trustee and the Plan Committee established under the confirmed joint chapter 11 plans in these bankruptcy cases (collectively, the "Plan Committee"), object to the claim of the United States Holocaust Memorial Council (the "Council") against Eli S. Jacobs ("Jacobs"). The Council has responded with a motion for summary judgment.

### FACTS

On March 29, 1993, an involuntary petition for relief under section 303(b) of Title 11, United States Code (the "Bankruptcy Code") was filed against Jacobs. On April 19, 1993, Jacobs consented to the entry of an order for relief under chapter 11 of the Bankruptcy Code (the "Order for Relief Date"). Also, on April 19, 1993, 375 Park Avenue Associates, Inc. ("Park Avenue Associates") and Park Partners, L.P. ("Park Partners", and collectively with Park Avenue Associates and Jacobs, the "Debtors"), each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By orders dated April 20, 1993, the three (3) chapter 11 cases were procedurally consolidated, and thereafter jointly administered.

On or about July 8, 1993, the Council filed proofs of claim numbers 17 and 20 in these chapter 11 cases for an unsecured prepetition claim in the amount of $3,000,000 (the "Claim"). The Claim is based upon a written pledge agreement dated September 30, 1988 by and between Jacobs and the Council (the "Pledge Agreement"). Under the Pledge Agreement, Jacobs pledged the amount of $3,000,000 to fund, in part, the construction of archives (the "Archives") for the U.S. Holocaust Memorial Museum (the "Museum"). In return for Jacobs' pledge, the Council agreed to name the Museum's archives in Jacobs' honor. Pledge Agreement ¶¶ 2–3. The Pledge Agreement further provides that in the event the Council is not an organization to which gifts are not tax deductible under the Internal Revenue Code, no further payments would be due thereunder. Pledge Agreement ¶¶ 1–3, 5.

On June 30, and July 1, 1994, confirmation hearings were held on the Debtors' Second Amended Joint Chapter 11 Plans (the "Plans"). The Plans were confirmed by an order of this Court dated July 1, 1994.

On or about July 8, 1994, the Debtors filed their Second Omnibus Objection to certain proofs of claim against the Debtors, including the Claim asserted by the Council. The stated ground for the Debtors' objection to the Claim in the Second Omnibus Objection was that Jacobs' charitable pledge to the Council lacked consideration and was unenforceable.

In response to the Second Omnibus Objection, the Council filed on August 9, 1994, an affidavit of Marvey Meyerhoff, Chairman of the Council, (the "First Meyerhoff Aff.") and, on August 15, 1994, a Memorandum of Law, arguing that the Claim should be allowed because the Pledge Agreement is enforceable under applicable state law.

The hearing on the Second Omnibus Objection was adjourned as to the Claim as settlement negotiations between the Plan Committee and the Council commenced. As a result of the breakdown of the settlement negotiations, the Plan Committee filed on January 18, 1995, the First Supplement to the Debtors' Second Omnibus Objection (the

"First Supplement"), as directed by this Court.

The basis for the Second Omnibus Objections, as amended, is that, regardless of the validity of the Pledge Agreement under state law, the Bankruptcy Code bars allowance of the Claim on the grounds that (1) the Pledge constituted a fraudulent conveyance and (2) assuming *arguendo* that the Pledge Agreement is an enforceable contract duly rejected by the Debtors pursuant to the Plans, the Council is barred from recovering damages on account of such rejection because it has failed to mitigate its damages. In response, the Council filed on March 24, 1995: (1) a motion for summary judgment, wherein the Council argues that (a) the Pledge Agreement is an enforceable bilateral contract which became enforceable immediately upon its execution by Jacobs on September 30, 1988, (b) the Pledge Agreement is not a fraudulent conveyance because it is supported by fair consideration, and (c) the Council had no duty to mitigate its damages; (2) a Memorandum of Law in support of the motion for summary judgment; (3) a Second Affidavit of Meyerhoff dated March 21, 1995 (the "Second Meyerhoff Aff."); and (4) a Reply Memorandum of Law to the First Supplement.

### DISCUSSION

#### A. *Summary Judgment*

 Under Rule 56(c) of the Federal Rules of Civil Procedure, made applicable in bankruptcy cases under Rule 7056 of the Federal Rules of Bankruptcy Procedure, the court may grant summary judgment when "the pleadings, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A fact is material if it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court must assess whether there are any factual issues to be tried, resolve ambiguities and draw reasonable inference against the moving party.

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). It is the moving party who bears the initial burden of showing the absence of genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

#### B. *Is the Pledge Agreement an Enforceable Contract Under New York Law?*

Early New York cases held that a charitable subscription, which is nothing more than a promise, is unenforceable if made without consideration. *Hamilton College v. Stewart*, 1 N.Y. 581 (1848); *Presbyterian Church v. Cooper*, 112 N.Y. 517, 20 N.E. 352 (1889); *Baptist Church v. Cornwell*, 117 N.Y. 601, 23 N.E. 177 (1890). However, in an attempt to balance public policy and general contract law, the New York courts have sustained charitable pledges on the grounds of either consideration or promissory estoppel. Some New York courts have found consideration in the traditional sense. *In re I & I Holding Corp. v. Gainsburg*, 276 N.Y. 427, 434, 12 N.E.2d 532 (1938). In *In re I & I Holding Corp. v. Gainsburg*, the court enforced the charitable pledge made by the donor " '[t]o aid and assist the Beth Israel Hospital in its humanitarian work, and in consideration of the promises of others contributing....' " In so holding, the court reasoned that consideration was given by the hospital when it relied upon the pledge "by proceeding in its work, securing other subscriptions, expending large sums of money and incurring large liabilities." *Id.* at 432, 12 N.E.2d 532.

 Other New York courts, applying the theory of promissory estoppel, have held that the charity's reliance on the promisee, such as its expenditure of money, labor, and time in furtherance of obtaining the subscription, will suffice as a substitute for consideration. *In re Keuka College v. Ray*, 167 N.Y. 96, 100, 60 N.E. 325 (1901) ("... a naked promise to pay money, bare of any condition, accepted by the promisee, to do something, will not be sustained; but ... where there is a request to the promisee to go on and render services, or to incur liabilities, on the faith of a sub-

scription, which request is complied with, the subscription would be binding"); *Tioga County General Hospital v. Tidd,* 164 Misc. 273, 298 N.Y.S. 460 (1937); *I & I Holding Corp. v. Gainsburg,* 276 N.Y. 427, 434, 12 N.E.2d 532 (1938); *Allegheny College v. National Chautauqua County Bank,* 246 N.Y. 369, 159 N.E. 173 (1927). Accordingly, the New York courts have uniformly held that a charitable pledge constitutes a unilateral contract, that, when accepted by the charity by incurring liability in reliance thereon, becomes a binding obligation. *In re Versailles Foundation, Inc.,* 202 A.D.2d 334, 610 N.Y.S.2d 2 (1994); *Laventhol & Horwath v. Moet–Hennessy, et al.,* 147 A.D.2d 366, 537 N.Y.S.2d 530 (1989); *Cohoes Memorial Hospital v. Mossey,* 25 A.D.2d 476, 266 N.Y.S.2d 501 (1966); *In re Field's Will,* 15 Misc.2d 950, 181 N.Y.S.2d 922 (1959); *Liberty Maimonides Hospital v. Felberg,* 4 Misc.2d 291, 158 N.Y.S.2d 913 (1957); *In re Metz' Estate,* 262 A.D. 508, 30 N.Y.S.2d 502 (1941); *In re Borden's Will,* 41 N.Y.S.2d 269 (1943).

In *Allegheny College,* the court held that the moment Allegheny College accepted $1,000 as payment on account of the donor's $3,000 pledge, which was conditioned on the establishment of a memorial to perpetuate the donor's name, Allegheny College assumed the "duty to do whatever acts were customary or reasonably necessary to maintain the memorial fairly and justly in the spirit of its creation." 246 N.Y. at 375, 159 N.E. at 175. The court in *Allegheny College* stated as follows:

> When the promisee subjected itself to such a duty at the implied request of the promisor, the result was the creation of a bilateral agreement.... There was a promise on the one side and on the other a return promise, made, it is true, by implication, but expressing an obligation that had been exacted as a condition of the payment.... We think the fair inference to be drawn from the acceptance of a payment on account of the subscription is a promise by the college to do what may be necessary on its part to make the scholarship effective.

*Id.* at 377–78, 159 N.E. at 176.

■ The Council argues that the Pledge Agreement created a binding bilateral contract at its execution because in exchange for Jacobs' pledge, the Council promised to create, maintain and support the Archives in Jacobs' honor. This is not enough to constitute consideration. The Council is a charitable organization authorized by an Act of Congress to commemorate and memorialize the Holocaust through the creation of the U.S. Holocaust Memorial Museum. First Meyerhoff Aff. ¶ 2. Because it was commissioned by Congress for that very purpose, it cannot be said that the Council's promise to construct the Museum, which would house, among other things, the Archives, was the promise which the Council gave Jacobs in exchange for Jacobs' pledge. Thus, while Jacobs was clearly supporting this eleemosynary enterprise through his $3 million pledge, the Council did what it was otherwise going to do, *to wit,* create the Museum. Furthermore, the Council's promise to create the Archives in honor of Jacobs is akin to "a promise for love and affection", and does not constitute consideration. *In re Burrell,* 159 B.R. 365, 370 (Bankr.M.D.Ga.1993) ("love and affection is not reasonably equivalent value ..."). Therefore, as of its execution, the Pledge Agreement was nothing more than a unilateral contract.

The next inquiry is when and how the Council performed in reliance on the Pledge Agreement to its detriment, thereby making the Pledge Agreement a binding obligation on both parties. The parties cite to several possible acts of the Council which could constitute reliance on the Pledge Agreement: (1) the Council argues that it acted in reliance of the Pledge Agreement when it commenced construction of the Museum in July, 1989; (2) alternatively, the Council argues that it acted in reliance of the Pledge Agreement when it used all its pledges, including the Pledge Agreement, as collateral to borrow funds to develop and construct the Museum and the Archives; and (3) the Plan Committee argues that the Council acted in reliance of the Pledge Agreement when the Council created the Archives.

■ In order to find detrimental reliance, the Council must have acted in a manner in accordance or compliance with the

conditions or purpose of Jacobs' pledge. While it may be implied that in order to create the Archives, the Council had to first construct the Museum, it cannot be said in earnest that the creation of the Museum was a contemplated condition to the Pledge Agreement. That is, regardless of when the Museum was constructed, the purpose of Jacobs' pledge was for the creation, maintenance and support of the Archives. The Council did, in fact, act in reliance of the Pledge Agreement when it used, among others, the Pledge Agreement as collateral for funds to construct the Museum *and* the Archives. Just as the donee in *Allegheny College*, when the Council borrowed funds in reliance of the Pledge Agreement, the Council took affirmative steps towards the implementation of the Pledge Agreement's terms, thereby obliging itself to name the Archives in Jacobs' honor. In the Court's opinion, the more direct evidence of the Council's reliance on the Pledge Agreement was when the Council commenced creation of the Archives. However, at this time the record is not clear as to when the Council placed the Pledge Agreement as collateral for the loans or when the Council actually commenced creation of the Archives. Accordingly, summary judgment on this issue is premature.

### C. Can the Pledge Agreement be Avoided as a Fraudulent Conveyance?

■■■ Under section 544(b) of the Bankruptcy Code, a trustee or debtor in possession, as a representative of creditors, is vested with the powers to avoid any transactions that are voidable under state law by a creditor who has an allowable unsecured claim.[1] The applicable law upon which the Committee relies is the New York Fraudulent Conveyance Act as adopted in New York Debtor–Creditor Law § 270, *et seq.* (McKinney 1990). Under section 273 of the N.Y. Debtor–Creditor Law, a transaction is deemed fraudulent if made by an insolvent for inadequate consideration, without regard to actual intent.[2] Thus, both the lack of fair consideration and insolvency are prerequisites to a finding of constructive fraud under Section 273.

■■■ The burden of proof of proving the lack of fair consideration and insolvency is on the party challenging the conveyance. *Pereira v. Goldberger (In re Stephen Douglas, Ltd.)*, 174 B.R. 16, 20 (Bankr.E.D.N.Y.1994); *American Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 191 A.D.2d 690, 595 N.Y.S.2d 537, 538 (2nd Dep't 1993).

■■■ Because the purpose of the fraudulent conveyance laws is to conserve the debtor's financial estate for the benefit of creditors, "fair consideration" for fraudulent conveyance purposes "means more than just the 'good and valuable' consideration needed to support a simple contract" under state law. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981); *accord, e.g., In re Young*, 152 B.R. 939, 949 (D.Minn.1993); *In re Grabill Corp.*, 121 B.R. 983, 994 (Bankr.N.D.Ill.1990). As the Second Circuit observed in *Rubin:*

> The reason for this requirement is obvious: if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain. By the same token, however, if the benefit of the transaction to the debtor does not substantially offset its cost to him, then his creditors have suffered, and ... the transaction was not supported by 'fair' consideration.

*Rubin, Id.* In determining whether fair and reasonable consideration has been given, the courts will focus on whether the debtor re-

---

**1.** Section 544(b) reads in pertinent part as follows:

> The trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim allowable under section 502 of this title....

**2.** Section 273 provides in relevant part as follows:

> Every conveyance or obligation incurred ... made by a person who is ... insolvent is fraudulent as to creditors without regard to actual intent if the conveyance is made ... without fair consideration. N.Y. Debtor & Creditor Law § 273 (McKinney 1990).

ceived an "economic benefit," either directly or indirectly. *Id.* at 991, 993. The courts have been reluctant to place a value on non-monetary consideration such as that alleged by the Council. *1992 Republican Senate–House Dinner Committee v. Carolina's Pride Seafood, Inc.,* 858 F.Supp. 243, 249 (D.D.C.1994), *vacated after settlement,* 158 F.R.D. 223 (D.D.C.1994) (court refused to recognize intangible rewards of political contribution as reasonably equivalent value for fraudulent conveyance purpose); *Zahra Spiritual Trust v. United States,* 910 F.2d 240, 249 (5th Cir.1990) (refusing to recognize spiritual fulfillment as fair consideration for a transfer to charity because "[t]he relevant inquiry ... is whether the debtor received monetary, not spiritual, consideration"); *In re Young,* at 946–49 (religious services, theological programs, spiritual counseling and use of church premises did not constitute reasonably equivalent value); *In re Treadwell,* 699 F.2d 1050, 1051 (11th Cir.1983) (love and affection are "of no benefit to creditors" and therefor cannot constitute reasonably equivalent value).

The Council urges this Court to adopt a *per se* arm's length bargaining test in finding fair consideration. That is, the Council argues that fair consideration was exchanged pursuant to the Pledge Agreement insofar as it was an arm's length transaction made in good faith. However, because the novel "arm's length bargaining" test advanced by the Council is not grounded in either New York law, the law of this Circuit or in the law of other Circuits, this Court rejects it and defers to the "economic benefits" test which is well rooted in the law of this Circuit.

In support of its argument, the Council incorrectly relies on *In re Morris Communications NC, Inc.,* 914 F.2d 458 (4th Cir.1990), and *In re Chomakos,* 170 B.R. 585 (Bankr. E.D.Mich.1993). Contrary to the Council's interpretation, however, the courts in both of these cases relied on an economic benefits evaluation in holding that risky investments can have economic value, leaving it to the courts to determine the extent of such value.

*In re Morris Communications NC, Inc.,* 914 F.2d 458, involved both a commercial transaction and an economic benefit valuation. In *Morris,* the Fourth Circuit reversed the bankruptcy court's finding that the debtor did not receive "reasonably equivalent value" for its sale of stock in a corporation whose sole asset was a cellular license application. In assessing the reasonable equivalence of the value of the stock sold by the debtor—"representing as it did mainly a lottery chance" that the corporation would win the license, *id.* at 475—the Fourth Circuit found that the factors to be considered included "the relation [sic] differences in the amount paid compared to the fair market value, and the percentage of [sic] the amount paid is of the fair market value." *Id.* at 467.

Similarly, in *In re Chomakos,* 170 B.R. 585, in addition to considering the "entertainment value" and the "economic value," albeit very risky, of the debtor's gambling, the court emphasized the actual and potential financial returns of gambling as fair consideration received. *Id.* at 592. In *Chomakos,* the trustee sought to avoid the debtor's gambling investments under the Michigan fraudulent conveyance laws. Although refusing to apply the rigid balance sheet test set forth in *Rubin,* which requires that "the value of the benefit received by the debtor approximates the value of the property or obligation he has given up," the court nevertheless did apply an economic benefits test. *Id.* at 592. The court applied what it called the "totality of the circumstances test," and looked to whether: (1) the transaction was entered at arm's length; (2) in good faith; (3) property was transferred to the debtor; and (4) the debtor received additional valuable benefits as a result of the transaction. First, the court looked at the gambling losses in relation to the amount spent at the tables, and found that "in relation to what [the debtor] expended, [the debtor] received in excess of seventy (70%) percent of the value transferred which, without realizing any other consideration received, is well within the seventy (70%) percent rule above noted and applied by some courts in determining reasonable adequacy." *Id.* at 591. Second, likening the debtor's gambling to the risky investment in *Morris,* the court emphasized the value to creditors of "the potential to earn more money than expended." *Id.* at 592–94.

Applying the economic benefits test, this Court finds that the undertakings by the Council under the Pledge Agreement cannot be said to offer any benefits, whether tangible or intangible, of monetary value to Jacobs' estate. Instead, the Council's promise to name the Archives in Jacobs' honor would inure solely to Jacobs' personal benefit, remaining with him following the bankruptcy in the form of goodwill and posthumous remembrance. While this Court recognizes that philanthropic actions are vital to the very existence of charitable organizations, such obligations cannot be undertaken at the expense of the donor's creditors. As the Court of Appeals for the Fifth Circuit stated in *Zahra Spiritual Trust v. United States,* 910 F.2d at 249, "a man must be just before he is generous."

While this Court agrees with the Plan Committee that the Pledge Agreement lacks fair consideration, it is not clear whether Jacobs was insolvent at the time he incurred his pledge obligation. Under the definition set forth in section 101(32) of the Bankruptcy Code, insolvency is measured by a balance sheet test, that is, whether the fair value of Jacobs' liabilities exceed the fair value of his assets. No evidence on this point has been presented to this Court.[3] Accordingly, summary judgment on this issue is premature.

### D. *Is the Pledge An Executory Contract Rejected Under the Plans, Requiring the Council to Mitigate Damages?*

In the event this Court were to find that the Pledge Agreement was not avoidable as a fraudulent conveyance, the Plan Committee argues that the Pledge Agreement constitutes an executory contract rejected under the Debtors' Plans requiring the Council to mitigate damages.

Section 365 of the Bankruptcy Code authorizes a debtor in possession to assume or reject executory contracts or unexpired leases subject to court approval. The legislative history of this section states that "[t]hough there is no precise definition of what contracts are executory, it generally includes a contract on which performance remains due to some extent on both sides." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6303; *accord NLRB Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984). A number of circuits have applied the "Countryman" definition of executory contracts, to *wit,* "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either party to complete the performance would constitute a material breach, excusing performance of the other." Countryman, Executory Contacts in Bankruptcy: Part I, 57 Minn.L.Rev. 439, 460 (1973); *Counties Contracting & Construction Co. v. Constitution Life Ins. Co.,* 855 F.2d 1054, 1060 (3d Cir.1988); *In re Speck,* 798 F.2d 279, 279–80 (8th Cir.1986); *In re Pacific Express, Inc.,* 780 F.2d 1482, 1487 (9th Cir. 1986); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers,* 756 F.2d 1043, 1045 (4th Cir.1985), *cert denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *In re Select–A–Seat Corp.,* 625 F.2d 290, 292 (9th Cir.1980); *see also, In re Atlantic Computer Systems, Inc.,* 173 B.R. 858 (S.D.N.Y.1994). Thus, under the Countryman definition, in order for a contract to be considered executory, there must be significant performance remaining on both sides.

Certainly, Jacobs' obligations under the Pledge Agreement remained substantially unperformed throughout the pendency of his chapter 11 case as he had not made any payment on his $3 million pledge. Likewise, the Council's obligations remained signifi-

---

3. At the hearing on this matter, the Plan Committee stated that it has withdrawn its argument that the presumption of insolvency under New York law applies in the instant case. This presumption of insolvency to which the Plan Committee refers, was applied where a voluntary transfer was made for *no* consideration. *See e.g., Feist v. Druckerman,* 70 F.2d 333, 334–35 (2d Cir.1934); *ACLI Gov't Sec., Inc. v. Rhoades,* 653 F.Supp. 1388, 1392–93 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988); *In re O.P.M. Leasing Services, Inc.,* 40 B.R. 380, 393 (Bankr.S.D.N.Y. 1984), *aff'd,* 44 B.R. 1023 (S.D.N.Y.1984); *In re Franklin Nat'l Bank Securities Litigation,* 2 B.R. 687, 710 (E.D.N.Y.1979), *aff'd,* 633 F.2d 203 (2d Cir.1980); *In re Stephen Douglas, Ltd.,* 174 B.R. at 21; *In re Cardon Realty Corp.,* 146 B.R. 72, 76 (Bankr.W.D.N.Y.1992).

cantly unperformed: (1) the Council's maintenance and support of the Archives was and is ongoing and perpetual; (2) the Council has not named the Archives after Jacobs; and (3) Jacobs' name is not displayed on the Archives by plaque or otherwise.

A refusal by either Jacobs or the Council to perform any of their respective remaining obligations, would certainly constitute a breach of the Pledge Agreement by both parties. Thus, the Pledge Agreement was an executory contract subject to Jacobs' rejection under section 365 of the Bankruptcy Code.

Pursuant to the Plans, all executory contracts not previously assumed or rejected by the Debtors or listed on a schedule annexed thereto, would be deemed rejected by the Debtors. *See* Plans, Amendments at 9–10. The Pledge Agreement was neither previously assumed by the Debtors nor among those being assumed by the Debtors under the Plans. Accordingly, the Pledge Agreement was rejected by the Debtors on the effective date of the Plans.

The Plan Committee next argues that because the Council had a duty to mitigate its damages arising from Jacobs' rejection and breach of the Pledge Agreement, the Council's $3 million damage claim should be reduced to the extent the Council could have mitigated its damages. *Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985) (New York's courts adhere to the universally accepted principal that a harmed plaintiff must mitigate damages"); *Tynan Incinerator Co. v. Int'l Fidelity Ins. Co.,* 117 A.D.2d 796, 797, 499 N.Y.S.2d 118, 120 (1986); *Jewish Press, Inc. v. Willner,* 190 A.D.2d 841, 594 N.Y.S.2d 51 (1993); *Bausch & Lomb, Inc. v. Sonomed Technology, Inc.,* 780 F.Supp. 943, 966 (E.D.N.Y.1992), *aff'd in relevant part,* 977 F.2d 720 (2d Cir.1992); *R and O Elevator Co. v. Harmon,* 93 B.R. 667, 672–74 (D.Minn.1988). The Plan Committee argues that the Council failed to mitigate its loss by not soliciting a substitute pledge.

■ It is not altogether clear whether the doctrine of mitigation applies to the Council's fund raising activities. First the cases cited by the Plan Committee do not involve charitable subscriptions.[4] Second, the Council argues that it could not effectively mitigate the loss of Jacobs' $3 million contribution because had the Council found another donor, it could have accepted both pledges. In this way, the Council likens itself to a lost volume seller, a well settled exception to the duty to mitigate. Under the lost volume seller doctrine, even though the seller sold the goods that the breaching buyer was obligated to purchase, the seller is entitled to the benefit of the both bargains because it would have made both sales had the buyer not breached its contract. *Neri v. Retail Marine Corp.,* 30 N.Y.2d 393, 285 N.E.2d 311, 334 N.Y.S.2d 165 (1972).

■ In support of its lost volume seller argument, the Council states that "anyone who would contribute $3 million for that particular honor [the naming of the Archives] would have made a comparable payment for another honorarium at the Museum. The Council has more honorariums at the Museum to offer than it has contributors." Second Meyerhoff Aff. ¶ 7. However, in an earlier affidavit, submitted before the Plan Committee raised the issue of mitigation, the Council acknowledges that there may exist "other donors who may have contributed greater amounts in consideration of having the Archives named in their honor instead." First Meyerhoff Aff. ¶¶ 8–9. Thus, by the Council's own statement, it appears that the naming of the Archives is a valuable asset for which others would pay substantial sums of money regardless of their ability to make general contributions to the Council. In light of these conflicting statements, summary judgment on this issue must be denied.

## CONCLUSION

For the foregoing reasons, the Council's motion for summary judgment is denied.

---

4. *See, e.g., Bausch & Lomb Inc. v. Sonomed Technology, Inc.,* 780 F.Supp. 943 (E.D.N.Y.1992) (sales/distributorship contract); *Jewish Press, Inc. v. Willner,* 190 A.D.2d 841, 594 N.Y.S.2d 51 (1993) (commercial contract); *Tynan Incinerator Co. v. International Fidelity Ins. Co.,* 117 A.D.2d 796, 499 N.Y.S.2d 118 (1986) (manufacturing/sales contract); *R and O Elevator Co. v. Harmon,* 93 B.R. 667, 672–74 (D.Minn.1988) (employment contract).

The parties are directed to schedule a hearing on the Plan Committee's Second Omnibus Objection to the Council's Claim.

The Plan Committee is directed to settle an order on five (5) days' notice consistent with this decision.