**In re Wayne B. HOLLINGSWORTH, Debtor.**

**Al BENNETT, as Assignee of Naples Air Center, Inc., and James V. Kilroe, Plaintiffs,**

**v.**

**Wayne B. HOLLINGSWORTH, Defendant.**

**Bankruptcy No. 94–10741–9P7. Adversary No. 95–152.**

United States Bankruptcy Court, M.D. Florida.

June 17, 1998.

Louis X. Amato, Naples, FL, for Plaintiff.

Dennis J. Levine, Tampa, FL.

Frank Kowalski, Naples, Fl.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THE MATTER under consideration in this Chapter 7 liquidation case is a challenge

of a debtor's right to protection of the general discharge and a request to determine whether a particular debt should be excepted from discharge. This adversary proceeding was commenced by James Kilroe and Al Bennett, as Assignee of Naples Air Center, Inc., (collectively "the Plaintiffs") naming Wayne B. Hollingsworth ("Debtor") as Defendant. The Plaintiffs challenged the right the Debtor to the protection of the general discharge. In addition, James Kilroe ("Kilroe") is seeking a determination of nondischargeability of the debt owed to him.

The claim in Count I of the Complaint is based on the allegation that the Debtor obtained funds from Kilroe by false pretenses, misrepresentation or actual fraud, and therefore the debt owed by the Debtor to Mr. Kilroe shall be declared nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

It is alleged in Count II that the Debtor obtained the funds from Mr. Kilroe while acting in a fiduciary capacity and that the Debtor breached his duty and was guilty of defalcation. It is contended that based on these facts that the debt owed to Mr. Kilroe shall be excepted from the overall protection of the general discharge by virtue of § 523(a)(4).

In Count III of the Complaint both Plaintiffs challenge the Debtor's right to protection of the general bankruptcy discharge based on the allegation that the Debtor transferred, or in the alternative, concealed property of the estate within one year preceding the commencement of this Chapter 7 case. Therefore, it is contended, this Court should deny the Debtor's discharge pursuant to § 727(a)(2).

The claim in Count IV is based on § 727(a)(4)(A). In this Count, both Plaintiffs contend that the Debtor knowingly and fraudulently made false oaths in connection with his Chapter 7 case; and therefore, he is not entitled to the protection of the general discharge by virtue of § 727(a)(4)(A).

The last claim, set forth in Count V, is based on the allegation that the Debtor failed to explain "drastic loss of value in real estate" and "bank accounts"; failed to account for income in his schedules and testimony; and continues to fail to explain losses of assets; and therefore he is not entitled to his discharge by virtue of § 727(a)(5).

In due course, the Debtor responded to the allegations in each of the five Counts of the Complaint. In his Answer, the Debtor, while making some perfunctory admissions including that the matter is a "core" proceeding, denied all the material allegations set forth in each and every Count of the Complaint.

After this Court denied the Plaintiff's Motion for Summary Judgment (Doc. No. 36), the claims were set for final evidentiary hearing at which time the following facts relevant to the issues under consideration were established.

## NONDISCHARGEABILITY CLAIMS OF KILROE SECTIONS 523(a)(2)(A),(4)

At the time relevant, the Debtor was a practicing attorney who maintained an office in Boston. The Debtor's daughter lived next to Mr. Kilroe, a fireman by occupation. Kilroe was involved in a heavily contested divorce and retained the Debtor to represent him. The Debtor also represented Kilroe in a probate proceeding that involved the Last Will and Testament of his aunt, who had recently deceased. Kilroe was the sole beneficiary under the Will. Under the testamentary trust established by the Will, the Trustee, one Mr. Davenport, an attorney, was named as the executor. Mr. Davenport was anxious to make the last distribution from the trust for the sum of $100,000 in order to close the probate estate. Kilroe became apprehensive that his wife might attempt to have the funds awarded to her in part or in whole in the then pending divorce proceeding. Kilroe sought advice from the Debtor about how to save the funds. The Debtor suggested that the check should be sent to him for safekeeping and that he would invest the money in something safe, preserving the principal. The Debtor told Kilroe that he should not know more about transaction because of the pending divorce. It is without dispute that at the instruction of the Debtor, Davenport issued two checks—one dated March 1, 1991 in the amount of $95,445.06; the other dated March 2, 1991 in the amount of $4,554.94 (Plt.'s Exh. 26)—and that Kilroe

picked up and mailed the checks to the Debtor for safekeeping.

When Kilroe requested the return of the funds, the Debtor informed him that the funds were tied up and that if Kilroe was in need of funds, he should cash in his IRAs. When Kilroe complained that he would have to pay a penalty for early withdrawal of the IRAs, he was assured by the Debtor that there would not be a penalty.

In addition, Kilroe also gave $81,000.00 to the Debtor for the purpose of paying certain of Kilroe's expenses during the pendency of the divorce proceeding, such as tuition expenses for Kilroe's children. When Kilroe demanded an accounting of the funds, he was told by the Debtor that he used $15,000 to pay taxes and his attorney's fees. Kilroe requested records to substantiate the disposition of the funds but the Debtor was unable to furnish any meaningful accounting of the disposition of the funds. Kilroe later learned that the Debtor did not pay the taxes. Also, the Debtor never provided Kilroe with a detailed statement of the legal services he claimed to have rendered to Kilroe. Meanwhile, the Kilroes' divorce proceeded. Upon receipt of a notice of a hearing, the Debtor told Kilroe that he could not handle his divorce, and sent Kilroe to another attorney, Mr. Sherman, whom Kilroe had never met before the hearing.

When Kilroe sought to recover the $100,-000, the Debtor informed him, in a letter dated April 7, 1994, that he had loaned the funds to an offshore corporation, Cayman U.S. Development, Ltd. ("Cayman"). (Dbt.'s Exh. 11). Kilroe never challenged the characterization of the transaction by the Debtor as a loan, even though this "loan" transaction was never documented. Kilroe never received a promissory note, there was no agreement to any fixed rate of interest, nor any fixed maturity date of the obligation. It is without dispute that the Debtor did not investigate the financial strength of Cayman, and never requested an operating statement nor a balance sheet from Cayman. Apparently, Cayman's only business was the acquisition of a residence located at 3163 Gin Lane in Naples, Florida. Kilroe was told by the Debtor that he would recover the $100,000

"loaned" to Cayman as soon as the Gin Lane property was sold.

It appears that the Gin Lane property was purchased by Cayman with the idea that it would be fixed up and sold at a profit. Although the $100,000 Kilroe gave to the Debtor was deposited in a segregated "client fund" account, some of the funds were used to satisfy a mechanic's lien claim that was incurred by Cayman when the Gin Lane property was remodeled. There is no hard evidence that the Debtor owned Cayman, although it is clear that he was to receive a fifty percent share of the net proceeds of the sale of the Gin Lane property when sold. Also, while the evidence on this point is not clear, it may be inferred that the Debtor also represented Cayman, and may have received some funds from the sale.

## OBJECTION TO THE DISCHARGE BY KILROE AND BENNET SECTIONS 727(a)(2), (a)(4)(A), (a)(5)

The Debtor's right to a discharge is not only challenged by Kilroe, but also by Al Bennet, who acquired his claim from Naples Air Center, Inc. by assignment. The claim of Bennet is based on a final judgment entered against the Debtor in the principal amount of $4,756.90 in a suit filed against the Debtor. The suit involved repair services rendered to an aircraft which ostensibly was not owned by the debtor, but rather by an entity know as LexAir, Limited ("LexAir").

## THE LEXAIR TRANSACTIONS

LexAir was incorporated in 1981 in New Hampshire by the Debtor who was sole officer and shareholder of the corporation. Since its inception, LexAir's assets have primarily consisted of different single aircraft at different times. The sole purpose of creating LexAir was to provide an airplane for the Debtor's law practice, ostensibly under a lease between LexAir and the Debtor's law firm, Hollingsworth and Associates, P.C. The Debtor, an accomplished pilot, had complete and exclusive control over the use of the planes owned by LexAir.

On September 20, 1989, the Debtor purportedly "sold" his shares representing full ownership in LexAir (Plt.'s Exh. 16) to Mi-

chael Mosca, who would soon become his son-in-law. It is without dispute and there is nothing in this record to show that the Debtor received any consideration for the transfer of his stock in LexAir.

LexAir's primary asset is an amphibious aircraft, a Lake Amphibian, which the Debtor claims that he leases from LexAir. The Lake Amphibian is the third plane LexAir has owned. On June 1, 1995, the Debtor entered into a lease with LexAir for the amphibious airplane. (Plt.'s Exh. 36). The lease has a term of one year, with automatic renewals for two years. The lease provides that the Debtor is responsible for all operating costs, including annual inspections, normal maintenance, fuel, insurance and registration, repairs and hangar costs, but the Debtor only pays LexAir $75.00 per hour of actual flight time. That is, under the terms of the lease, if the Debtor chose not to fly the Lake Amphibian for a period of one year, he would owe nothing to LexAir. There is competent evidence in the record that shows this lease is totally commercially unreasonable. What amount if anything the Debtor has paid to LexAir under the lease arrangement is in serious doubt.

At the time of the commencement of this Case, LexAir still owned the Lake Amphibian and it is without dispute the Debtor had, and still has exclusive control and use of the airplane although the airplane is technically owned by LexAir and leased to the Debtor. In addition to the planes, LexAir has also owned a Jeep, a Volkswagen and an enclosed trailer. After the stock transfer, the Debtor also continued to use the Volkswagen and the trailer. The Debtor still has complete control over the Lake Amphibian, which he maintains at the Daytona fly-in community where he presently lives, and at a property in Maine ostensibly owned by a Trust where the Debtor spends his summers.

## THE LAND TRUSTS

In 1971 the Debtor built a home in Mount Vernon, Maine, where he resides between May and October. He resides in Florida from October until April. The Maine residence is claimed to be owned by the Die Spitze Realty Trust which was created by the

Debtor in 1981. The Debtor's wife is the Trustee and his children are the beneficiaries of this Trust. On April 1, 1981, the Debtor and his wife transferred their ownership of the Maine residence to this Trust. The Debtor has unrestricted use of the property and pays nothing to the Trust for this use. A second Trust, Die Spitze Realty Trust II, was created by the Debtor on November 9, 1984. The corpus of this Trust is a vacant lot adjacent to the residence. The Debtor serves as Trustee for this Trust and the Debtor's children are the beneficiaries.

The residence, in addition to having six rooms, also has a guest house where the Debtor stays while in Maine. The guest house, which has one bedroom and a three-car garage, is rented for $1,500 per month. When the residence is rented, the rent is paid to the Trust. The record shows that the Debtor has paid rent to the Trust for a total of four months since the Trust was created. He now pays nothing, even though he is not a beneficiary of the Trust.

The lakeside house has a ramp built to accommodate the Lake Amphibian claimed by the Debtor to be owned by LexAir. This is the very same aircraft which was serviced and repaired by Naples Air Center, who sued the Debtor for the charges incurred but not paid by either LexAir or by the Debtor, who had contracted for the services.

## THE MOTOR HOME

The Maine residence also has a barn where the Debtor was keeping a 1988 Bluebird motor home (VIN: 1BBCNBK81JF076733) that he used, but again claimed to be not owned by him, but rather by his law firm, Hollingsworth & Associates, P.C. (the "law firm").

At the time relevant, Harold Warren Construction Co. ("Warren") contracted with the Debtor to perform certain improvements to the Maine property, such as constructing an area to house an airplane fuel storage tank, building retaining walls and other major landscaping. Warren, having failed to receive payment of approximately $20,000, sued the Debtor, and in 1985 obtained a judgment. Meanwhile, the Debtor's law firm apparently

lost its single major client and the Debtor continued to operate as a solo practitioner out of his home in Belmont, Massachusetts. On April 21, 1993, a Maine District Court ordered the Debtor to convey all interest in the law firm to Warren toward satisfaction of the judgment. (Plt.'s Exh. 28) It appears that the law firm's sole asset at this time was the motor home. The Debtor transferred the stock in the law firm to Warren on September 16, 1993. Warren attempted to obtain possession of the firm's motor home, which the Debtor continued to use and have complete control of, to satisfy the judgment, but his efforts were unfruitful because the Debtor hid and moved the motor home between Maine and Florida.

The Debtor dissolved the firm on January 3, 1994, and the title to the motor home was transferred from the law firm to the Debtor's wife on January 19, 1994. The Debtor and his spouse spent approximately the next two years travelling about the country in the motor home. It is without dispute that the Debtor had exclusive control and use of the motor home. During the two-year period of travel, the Debtor was employed by an emu and ostrich ranch in Texas and worked on isolated legal cases in Alaska and New York. The Debtor also spent some time at the Maine property and also in Naples at the Gin Lane property owned by Cayman. There is no indication in this record that the Debtor paid anything to Cayman for the use of the property. The Gin Lane property was sold in 1996 for $1.5 million. The Debtor, who held the power of attorney, signed the deed on behalf of Cayman. It is without dispute that Kilroe never received any of the proceeds obtained from the sale of the Gin Lane property.

The Debtor traveled in the motor home until February, 1996, at which time he was faced with an another attempt by Warren to collect on his judgment. The Debtor told Warren that the motor home was fully encumbered by a lien securing a $185,000 debt owed to Novus Financial Corp. ("Novus"). While the amount that the lien secured might have been true, it is without dispute that the Debtor negotiated a settlement with Novus who agreed to accept $97,134 in satisfaction of the debt. One week later the Debtor placed the motor home for sale through a consignment arrangement. The motor home was eventually sold for $145,000, of which Novus received $86,267.15; the Debtor received $13,732.85, purportedly to repay a loan needed to pay the original installment of the settlement arrangement with Novus; and the Debtor's son-in-law, Michael Mosca, who according to the Debtor paid the original down payment on the motor home, received $45,000. It is clear that it was not in fact a bona fide debt and that Mosca in fact returned the $45,000 to the Debtor. The motor home was sold together with an enclosed trailer, which could be towed behind the motor home and was large enough to carry other vehicles, including aircraft. The trailer was owned by LexAir, but it is clear none of the sales proceeds were paid to LexAir.

In addition to the Maine residence, the Debtor maintains a residence in Daytona Beach at Spruce Creek, a fly-in community, claimed to have purchased by his wife for $350,000. The Debtor's wife had no meaningful employment at the time of this acquisition. The residence has 1,500 square feet of living area which includes a living room, and two smaller rooms. All the rooms are furnished.

Upon these facts, both Plaintiffs contend that the Debtor is not entitled to the protection of the general discharge pursuant to sections 727(a)(2), (a)(4)(A) and (a)(5) of the Bankruptcy Code. Moreover, Kilroe contends that the Debtor's obligation to him is not dischargeable pursuant to sections 523(a)(2)(A) and (a)(4).

### SECTION 727 OBJECTIONS TO DISCHARGE

■ Section 727 of the Bankruptcy Code provides, in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed transferred, removed, destroyed, mutilated or concealed –

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

\* \* \*

(4) the debtor knowingly and fraudulently, or in connection with the case—

(A) made a false oath or account;

\* \* \*

5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

A party objecting to a discharge has the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### FRAUDULENT CONCEALMENT OR TRANSFER OF PROPERTY SECTION 727(a)(2)

■ The Plaintiffs seek a denial of the general discharge pursuant to § 727(a)(2) for fraudulent concealment or transfer of property. The Plaintiffs allege that the Debtor fraudulently concealed or transferred his interest in LexAir. To prevail on this count, the Plaintiffs must establish that:

(1) A transfer of property occurred;

(2) It was the property of the Debtor, or property of the estate;

(3) The transfer of the Debtor's property occurred within one year of the date of the filing of the petition, or the transfer of property of the estate occurred post-petition;

(4) The Debtor had at the intent to hinder, delay or defraud a creditor at the time of the transfer.

*In re Metz,* 150 B.R. 821, 824 (Bankr. M.D.Fla.1993).

■ This matter is somewhat complicated because of the Debtor's ability to conceal LexAir's primary asset, the airplane. It is without dispute that the Debtor was LexAir's sole shareholder at the time of incorporation. While it is true that the airplane was never technically owned by the Debtor, it is equally clear that the bogus stock transfer and purported lease were merely tools to cover the fact that the Debtor had, and still has absolute control of the airplane and is still the owner of all the corporate assets of LexAir, to wit, the airplane. Hence, this Court is satisfied that the corporate assets are, in fact, property of the Debtor.

It is also clear that the Debtor's purported sale of the shares to Mosca was merely a sham transaction – the debtor never received any consideration for the transfer. This Court is constrained to reject the sham transaction and is satisfied that the lease back to the Debtor was merely designed to put a legitimate gloss on the use of the airplane.

The concealment of an interest in an asset that continues into the year before bankruptcy constitutes a form of concealment that occurs within the year before bankruptcy. *Thibodeaux v. Olivier (In re Olivier),* 819 F.2d 550, 553 (5th Cir.1987); *see also In re Sausser,* 159 B.R. 352, 355 (Bankr.M.D.Fla. 1993). Hence, such concealment falls within the ambit of § 727(a)(2)(A). *Id.*

■ The Debtor's purported transfer of the LexAir stock occurred on September 20, 1989, more than one year prior to the Debtor's filing of his bankruptcy petition on November 4, 1994. However, the Debtor continued the concealment of his interest in LexAir, and hence the airplane, into the year prior to bankruptcy.

■ Because it is doubtful that debtors who transfer property with the necessary intent under § 727(a)(2)(A) will disclose their motivation, the intent to frustrate creditors can be inferred from conduct. *Olivier* at 553; *see also In re Devers,* 759 F.2d 751, 754 (9th Cir.1985)(intent may be based on circumstantial evidence or on reasonable inferences which may be drawn from a course of conduct).

■ Specific "badges of fraud" which may be used by the Court as indicia of intent include:

1. The lack or adequacy of consideration;
2. the family, friendship or close association between the parties;
3. the retention of possession, benefit or use of the property in question;
4. the financial condition of the party sought to be charged both before and after the transaction in question;
5. the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt on set of financial difficulties, or pendency or threat of suits by creditor; and
6. the general chronology of the events and transactions under inquiry.

*Cohen v. Pond (In re Pond)*, 221 B.R. 29 (Bankr.M.D.Fla.) (citing *Mahon v. Milam (In re Milam)*, 172 B.R. 371, 374 (Bankr. M.D.Fla.1994)). Moreover, the retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer. *Olivier* at 553. Further, concealing property for purposes of § 727(a)(2)(A) can be accomplished by a transfer of title coupled with the retention of the benefits of ownership, thus effecting a sham transfer. *Sausser* at 356 (citing *Olivier*).

■ After examining the totality of the circumstances and applying the badges of fraud to the instant case, this Court is satisfied that the Debtor, through the scheme of disposition of the stock in LexAir and sham lease, did in fact conceal his true interest in the LexAir stock and, in turn, his interest in the airplane owned by LexAir. There is nothing in the record to show that the Debtor received any consideration for his stock in LexAir. Also, there was a close association between the parties—Mosca was soon to become the Debtor's son-in-law. Furthermore, the Debtor retained complete dominion and control over LexAir and its assets. Mosca never had and never will have use and disposition of LexAir or the airplane. As to application of the last three badges of fraud, the record is not very clear about the Debtor's financial situation at the time of the transfer to Mosca in 1989, although it appears that it

occurred about the same time that the Debtor's law practice lost its sole major client and was forced to close its doors. Moreover, the Debtor was attempting to avoid Warren's satisfaction on his judgment at the relevant time.

This Court is satisfied that the record more than sufficiently supports the denial of discharge pursuant to § 727(a)(2)(A).

## SECTION 727(a)(4)(A) FALSE OATH

■ In order to prevail on a claim to deny a discharge pursuant to § 727(a)(4)(A) a plaintiff must establish that the debtor knowingly and fraudulently made a false oath and that the oath pertained to a material fact. *Metz* at 824. A knowing and fraudulent omission from a debtor's schedules can constitute a false oath. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984). An inference of knowing and fraudulent intent can be drawn from circumstances surrounding and observations of the debtor. *In re Sklarin*, 69 B.R. 949, 953 (Bankr.S.D.Fla. 1987).

■ In the instant case, the Debtor did not list any interest in LexAir nor the airplane on his Schedules of Assets. However, the airplane was never technically owned by the Debtor individually. The airplane was facially always owned by LexAir. Moreover, legal ownership of LexAir is held by Mosca. After examining the circumstances surrounding the Debtor's transactions, including those regarding LexAir, this Court finds that the proof presented in support of false oath under § 727(a)(4)(A) falls far short of the quantum of proof required to establish each element.

## SECTION 727(a)(5) FAILURE TO EXPLAIN LOSS OF ASSETS

■ Section 727(a)(5) states that a debtor will be denied a discharge where "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." The plaintiff has the burden of identifying the assets in question and showing that the debtor at one time had the assets and that the assets are not presently available for creditors. Rule 4005, Rules

of Bankruptcy Procedure. *In re Sklarin,* 69 B.R. 949, 952 (Bankr.S.D.Fla.1987).

 The Debtor has been travelling around the country in a motor home. It is fair to infer that what income he had during this period he used for travelling expenses. Moreover, the $100,000 that the Debtor received from Kilroe was not an asset of the Debtor. The money belongs to Kilroe. This Court finds that the Plaintiffs have failed to meet their burden to prove failure to explain deficiency of assets pursuant to § 727(a)(5).

## SECTION 523 EXCEPTIONS TO DISCHARGE

Ordinarily this Court would not find it necessary to discuss the exceptions to discharge under § 523 because of this Court's denial of the Debtor's general discharge pursuant to § 727(a)(2)(A). However, given the complexities of the transactions underlying this Case, this Court will address Kilroe's claims under § 523(a)(2)(A) and (a)(4).

At the conclusion of the presentation of the claim on nondischargeability of Kilroe, the Debtor moved to dismiss the claim pursuant to F.R.B.P. 7041(b). This court, having considered the evidence presented by the Plaintiff in support of the claim, and having concluded that the proof presented was insufficient to establish a prima facie case, granted the Motion and announced that the claim based on 11 U.S.C. § 523(a)(2)(A) will be dismissed. This leaves for consideration the claim of nondischargeability based on Section 523(a)(4).

**§ 523. Exceptions to discharge.**

**(a)** A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

 The burden of proof to sustain a claim of nondischargeability pursuant to § 523 of the Bankruptcy Code is on the party seeking to except the debt from discharge by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To prevail on an objec-

tion to dischargeability for defalcation while acting in a fiduciary capacity, a plaintiff must establish that: 1) The debtor was a fiduciary within the meaning of this term as used in § 523(4); 2) he breached his duty as a fiduciary; and 3) he was guilty of defalcation. *Jones v. Francisco (In re Francisco),* 204 B.R. 247 (Bankr.M.D.Fla.1996). Moreover, the trust relationship must predate and exist prior to the commission of the alleged wrong and not as a result of the commission of the alleged wrong. *Lee v. Crosswhite (In re Crosswhite)* 91 B.R. 156, 160 (Bankr.M.D.Fla.1988)(citing *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980)). For purposes of § 523(a)(4), defalcation while acting in a fiduciary capacity is defined as "the slightest misconduct, and it need not be intentional conduct; negligence or ignorance may be defalcation." *Crosswhite* at 160 (quoting *Morales v. Codias,* 78 B.R. 344, 346 (Bankr.S.D.Fla.1987)). Defalcation can be shown by simply proving that a fiduciary failed to return or account for property. *Id.*

 Although the definition of "fiduciary" under § 523(a)(4) is a matter of federal law, bankruptcy courts must look to state law in determining whether a fiduciary relationship exists. *Crosswhite* at 159 (citing *Ragsdale v. Haller,* 780 F.2d 794 (9th Cir.1986)). The Florida Rules of Professional Conduct place lawyers under a fiduciary duty in handling a client's funds. Fla. Rules of Prof. Conduct R.4–1.15; *see also Ball v. McDowell (In re McDowell)* 162 B.R. 136, 138 (Bankr. N.D.Ohio 1993); *see also Ducey v. Doherty,* 160 B.R. 465 (Bankr.D.N.H.1993) (New Hampshire Rules of Professional Conduct placed attorney who held client funds in fiduciary relationship with client for purposes of § 523(a)(4)).

 It is without a doubt that the Debtor had entered into a fiduciary relationship with Kilroe. Moreover, there is no doubt that the fiduciary relationship arose prior to any discussions about the transfer of the $100,000 to the Debtor. Kilroe had previously retained the Debtor to represent him in his pending divorce. The record shows that the Debtor breached that fiduciary duty by failing to return and failing to account for

the $100,000. Moreover, even if the $100,000 was a "loan" from Kilroe to the Debtor, the Debtor's actions with regard to the transaction fell far short of the standard imposed upon a fiduciary. The Debtor testified that he never once examined, or even asked to look at, the financial statements of Cayman.

The evidence is clear that based on their attorney-client relationship, the Debtor owed a fiduciary duty to Kilroe. It is equally clear that the Debtor breached that fiduciary duty and committed defalcation as a fiduciary.

A separate Final Judgment in accordance with the foregoing shall be entered by this Court.