**In re Dexter Jerome CUTTS, Debtor.**

**Bank of Dawson, Plaintiff,**

v.

**Dexter Jerome Cutts, Defendant.**

**Bankruptcy No. 98–10975.
Adversary No. 98–1049.**

United States Bankruptcy Court,
M.D. Georgia,
Albany Division.

April 12, 1999.

Ben F. Easterlin, IV, Ellis, Easterlin, Peagler, Gatewood & Skipper, P.C., Americus, Georgia, for debtor.

T. Lee Bishop, Jr., Albany, Georgia, for Bank of Dawson.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on a Complaint filed by Bank of Dawson pursu-

ant to 11 U.S.C. § 727(a)(2)(A), (a)(4)(A) objecting to the discharge of Dexter Jerome Cutts's debts. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(J). After considering the pleadings, evidence and applicable authorities, the Court enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052.

## Findings of Fact

On April 3, 1997, Dexter Jerome Cutts ("Debtor") renewed a loan from Bank of Dawson ("Bank") promising to repay $45,-427.93 on or before November 4, 1997.[1] Debtor was unable to pay the debt in November and, as a result, defaulted on the loan. On February 10, 1998, Debtor received a letter from Bank's attorney demanding payment of the debt. Failing to receive satisfaction of this debt, Bank sued Debtor on March 17, 1998. In response to the suit, Debtor's attorney sent a letter to Bank's attorney on March 26, 1998 notifying him that Debtor was contemplating filing a Chapter 7 bankruptcy petition. During the pendency of the suit, Debtor attempted, in the words of Debtor, to "work something out" with Bank and provided a written financial statement outlining his assets and liabilities as of April 6, 1998. When Debtor and Bank failed to reach an agreement, Bank proceeded with the suit and obtained a default judgment on May 22, 1998 for $67,405.10 followed by a writ of Fieri Facias on June 2, 1998.

On July 13, 1998, Debtor sought relief from his debts by filing a petition under Chapter 7 of the Bankruptcy Code. Bank then filed this complaint objecting to Debtor's discharge alleging that Debtor transferred property pre-petition with the intent to hinder, delay, or defraud his creditors, and that in filing his petition he knowingly made a false oath by omitting and misstating several required disclosures in his schedules. Bank asserts that Debtor made the transfers, omissions and misstatements with the fraudulent intent of deceiving the Chapter 7 trustee into believing that he had no non-exempt assets from which his creditors' claims could be satisfied.

### Alleged Transfers With Intent To Hinder, Delay, or Defraud— 11 U.S.C. § 727(a)(2)(A)

1. *1994 Corvette.* In December 1996, Debtor obtained · a $24,068.00 loan from Security Bank to purchase a 1994 Chevrolet Corvette convertible. Security Bank is not related to Plaintiff, Bank of Dawson. Security Bank retained a security interest in the Corvette as collateral for the loan. The loan agreement required Debtor to make monthly payments of $618.67. In addition, Debtor was required to pay approximately $3,600.00 per year for insurance on the vehicle. On November 26, 1997, Debtor sold the Corvette to his brother, John Nathan Fish ("Fish"), for $19,998.03. The sale price was determined by the amount of the payoff on the Security Bank loan. Debtor used the proceeds of the sale to satisfy his debt to Security Bank. Fish financed the purchase with a new loan from Security Bank. The monthly payments at $505.47 were less than Debtor had been paying, and Fish was able to insure the Corvette for approximately $1000.00 per year.

Despite the fact that Fish lives at 272–B Fish Road, Desoto, Georgia, the borrower's address on Fish's Security Bank note was listed as 3931 Rodnor Forest Lane, Albany, Georgia—Debtor's home address. In addition, the vehicle is normally garaged in Albany in a shed located on the premises of Debtor's employer. Fish prefers to drive his 1972 pick-up truck to work. Debtor is allowed access to the

---

1. The debt arose as a consequence of Debtor's guarantee of his father's farm loan in 1996. Debtor's guarantee was sought by his father as being the only way the father could keep farming. Debtor had no interest in the farming operation and did not expect to receive any personal financial benefit.

Corvette whenever he wants. While Debtor did not use the Corvette as a primary vehicle, his use amounted to thirty percent of the vehicle's total use. Despite the fact that .Fish's note from Security Bank is current, Fish has yet to make a payment. All payments on the Corvette have been made by Debtor. Debtor makes these payments in addition to the $175.72 monthly payments on his 1994 Ford Ranger pick-up truck. On his financial statement presented to Bank, Debtor listed his annual car expense as $6,000.00, indicating a monthly car expense of $500.00.

2. *1992 Mazda.* On April 25, 1997, Debtor purchased a 1992 Mazda pickup truck with a $5,250.54 loan obtained from Security Bank. Security Bank retained a security interest in the Mazda as collateral for the loan. In his financial statement presented to Bank Debtor estimated the value of the 1992 Mazda on April 6, 1998 was $4,500.00. However, eighteen days later, Debtor sold the Mazda to Fish for $3,579.88, the amount Debtor still owed to Security Bank. Debtor used the proceeds of this sale to satisfy his debt to Security Bank. Again, Fish financed this purchase with a loan from Security Bank. This time, Fish's address is listed as the borrower's address. Fish purchased the Mazda for use by his son and has made all payments on the truck.

### Alleged False Oath—11 U.S.C. § 727(a)(4)(A)

At the hearing, Bank urged that Debtor knowingly made a false oath with fraudulent intent when he submitted his bankruptcy schedules with his petition filed on July 13, 1998. Bank claims the following items were either omitted from or misstated on those schedules:

1. *Corvette Payments.* Debtor has made all of the monthly car payments owing on Fish's car loan from Security Bank for the Corvette despite the fact that Debtor is not legally obligated to make such payments. Debtor listed his annual car expense on his Financial Statement presented to Bank on April 6, 1998 as being $6,000.00—indicating his car expense was $500.00 per month. Bank complains that Debtor misrepresented his car expense. Debtor testified that because he was not obligated to make the payments, he did not believe that he was required to include this expense in his schedules. The Court accepts Debtor's explanation as reasonable.

2. *Corvette Ownership.* Despite having sold the Corvette to his brother, thirty percent of its use is by Debtor. In addition, the Corvette is garaged in a shed on the premises of Debtor's employer, and Debtor has made all loan payments on the Corvette. Bank complains that Debtor did not list the Corvette as an asset in his schedules. Debtor testified he did not do so because he does not legally own the vehicle and has no agreement with his brother to become the owner of it. The Court accepts Debtor's explanation as reasonable.

3. *Mother's Household Expenses.* Debtor contributed to his mother's household expenses. Such contributions were not in regular amounts, but rather varied depending on his mother's needs. Debtor testified at trial that these contributions ceased because of an arrangement with his brother whereby his brother would cover his mother's expenses to offset Debtor's payments on the Corvette note. Bank complains that Debtor did not list this expense in his schedules. Debtor testified he did not do so because he believed that since his contributions had ceased he had no such expense to include in his schedules. The Court accepts Debtor's explanation as reasonable.

4. *5–Star Credit Union Checking and Savings Account.* As of June 30, 1998, Debtor had $751.81 in this checking account and $208.10 in this savings account. Bank complains that while Debtor listed a $900.00 total in these accounts in his financial statement presented to Bank, he failed to list the existence of these accounts on his bankruptcy schedules. Debtor testi-

fied that when he reviewed his petition he saw "5-Star Credit Union" was listed in his schedules and believed this listing included his 5-Star checking and savings accounts. However, Debtor later realized that what he saw when reviewing his petition was the listing of his 5-Star Credit Union credit card liability. The Court accepts Debtor's explanation as reasonable.

5. *Security Bank Personal Checking Account.* On July 10, 1998, Debtor's personal checking account at Security Bank had a balance of $3,084.12. Debtor had received a paycheck on July 10, 1998 for $2,213.94. The deposit of this check appeared on July 15, 1998, two days after the case was filed. Debtor said that after reviewing his check register and considering the checks which he had written but which had not yet cleared the bank, he decided to list in his schedules that as of July 13, 1998, the date of filing the case, that this account had a balance of $100.00. Bank complains that Debtor made a false oath in his schedules by listing a balance of $100.00 when the bank statement showed a checking account balance of $1041.85 seven days after the case was filed. The Court finds Debtor's explanation as reasonable.

6. *Security Bank Farm Account.* Farm Services Center set up a checking account in both its and Debtor's name to be used for funding Debtor's father's farming operations. Debtor was authorized to write checks from the account. However, Debtor was not authorized to write any checks for his own benefit, and none of his personal funds passed through the account. Bank complains that Debtor did not list the existence of this account in his schedules. Debtor testified that, because he received no financial benefit from the account, he did not believe it was property which he was required to include in his schedules. The Court finds Debtor's explanation as reasonable.

7. *Garnishment.* Debtor's employer withheld funds from two of Debtor's paychecks—$441.00 from his June 25, 1998 paycheck and $633.12 from his July 10,

1998 paycheck. Ultimately, these funds were returned to Debtor after he filed his bankruptcy petition. Bank complains that Debtor did not list his interest in these funds in his schedules. Debtor testified that this money was not returned to him before he filed his schedules, and further, that he had no expectation prior to filing his petition that he would recover the funds. The Court finds this explanation as reasonable.

8. *Cruise.* On June 24, 1998, Debtor wrote a check for $950.00 to pay for a cruise. Bank complains that Debtor listed his entertainment and recreational expenses in his schedules as being $50.00 per month, an amount which did not include the cruise expense. Debtor testified that he made the commitment to purchase the cruise several months before this June 24, 1998 payment. He does not expect the cruise to be a recurring expense. The Court finds Debtor's explanation as reasonable.

9. *Payments to Fish.* On February 15, 1998, Debtor wrote a check to his brother, Fish, in the amount of $75.00. Debtor wrote on the check that the payment was for car insurance. However, at trial, Debtor testified that the payment did not go toward car insurance. On March 2, 1998, Debtor wrote another check to his brother, this time for $500.00. Debtor testified that he made payments such as these to his family members when they were needed and requested. Debtor did not expect repayment from his brother and did not consider such payments as mere gifts, but rather saw such payments as part of his responsibility to help his family when needed. Bank complains that Debtor did not list the payments as loans or gifts. These payments were not made on a regular basis, and therefore, Debtor did not believe that he needed to include such payments in his schedules either as gifts or loans. The Court finds Debtor's explanation as reasonable.

10. *Engagement Ring.* On October 31, 1997, Debtor obtained a $4,000.00 loan from Security Bank for the purchase of an engagement ring. Debtor presented the ring to his fiancée, but, before he filed bankruptcy, the ring was returned to Debtor when the engagement was broken. Debtor returned the ring to the jewelry store where it was purchased for a full cash refund. However, rather than satisfying his obligation to Security Bank, Debtor put $2,700.00 of the refund into a Certificate of Deposit at Security Bank. Debtor testified that the remaining $1,300.00 was disclosed in his schedules as part of a Security Bank deposit account. However, Debtor reported that the balance of the Security Bank checking and savings accounts totaled only $500.00. Bank complains that Debtor never reported the gift of the ring to his fiancée. The Court finds Debtor's explanation as reasonable.

11. *Taxes.* For tax year 1996, Debtor reported $49,000.00 in losses from farming operations. As a result, Debtor was refunded approximately $14,000.00 from the IRS. Debtor stated that he might be able to claim deductions for crop losses in 1997. The Court heard no evidence about how much of a loss he might be able to claim. Bank complains that Debtor did not file taxes for the 1997 tax year because he intends to offset his losses in 1997 against $60,000.00 he received in crop insurance proceeds in 1998. Bank complains further that because Debtor did not file his 1997 taxes, he did not list in his schedules the refund he may have been entitled to for the 1997 tax year. Debtor testified that he did not believe he was entitled to a refund in 1997 despite the losses.[2] The Court accepts Debtor's explanation as reasonable.

12. *Sears Account.* On February 23, 1998 and April 21, 1998, Debtor made payments on a Sears Account. Bank complains that Debtor did not disclose the existence of this account in his schedules. Debtor testified that this account was paid in full and closed prior to his filing bankruptcy. The Court finds Debtor's explanation as reasonable.

13. *Proctor and Gamble Stock.* At the close of the hearing, the Court permitted the parties to submit letter briefs to the Court analyzing the case law relevant to this proceeding and summarizing the evidence presented at trial. Bank took this opportunity to present to the Court additional evidence not heard at the trial regarding Debtor's ownership of Proctor & Gamble stock. Bank charges that Debtor made a false oath when he listed in his schedules only the value of the Proctor & Gamble stock without also including the number of shares owned by him. Because the Court was not presented with any evidence that valuation of this stock was incorrect, the Court declines to consider this additional allegation.

*Conclusions of Law*

██ The Bankruptcy Code's discharge provision is contained in 11 U.S.C. § 727. Its purpose is to allow insolvent debtors a chance to "make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Chase Manhattan Bank v. Ford (In re Ford)*, 186 B.R. 312, 316 (Bankr.N.D.Ga.1995) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)). However, this opportunity is only afforded to the honest, yet unfortunate debtor. *Id.* In order to ensure that only honest debtors get the benefit of this fresh start, the Code provides exceptions to its discharge provision. The Code at 11 U.S.C. § 727(a) contains exceptions which if satisfied, completely deny the debtor's discharge "causing all creditors to continue to have a postpetition claim against the debtor and his present and future assets." *Coggin v.*

---

**2.** Debtor is employed as a car salesman. His right to claim "crop losses" appears to arise as a result of his financial support of his father's farming operation.

Coggin (In re Coggin), 30 F.3d 1443, 1452 (11th Cir.1994). Because denial of discharge is an extreme step, all subsections of 727(a) must be construed liberally in favor of the debtor. *La Brioche, Inc. v. Ishkhanian (In re Ishkhanian)*, 210 B.R. 944, 949 (Bankr.E.D.Pa.1997). The party objecting to a discharge has the initial burden of producing evidence establishing the basis for the objection. But once that party has done so, the burden shifts to the debtor to explain satisfactorily its conduct. *See Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *Adams v. Watson (In re Watson)*, 122 B.R. 476, 480 (Bankr.M.D.Ga.1990). "To be satisfactory, 'an explanation' must convince the judge." *Chalik*, 748 F.2d at 619.

Bank has asserted that Debtor's conduct satisfies two exceptions to discharge contained in sections 727(a)(2)(A) and 727(a)(4)(A). The Court will first address the challenge to Debtor's discharge under section 727(a)(2)(A).

## I. *11 U.S.C. § 727(a)(2)(A)*

■ Section 727(a)(2)(A) provides, in pertinent part, as follows:

(a) The court shall grant the debtor a discharge, unless—(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, ... or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A). Thus, to prevail on this count, Bank must show that:

1) A transfer of property occurred;

2) It was the property of the Debtor, or property of the estate;

3) The transfer of the Debtor's property occurred within one year of the date of the filing of the petition, or the transfer of property of the estate occurred post-petition;

4) The Debtor had at [sic] the intent to hinder, delay or defraud a creditor [or the trustee] at the time of the transfer.

*Bennett v. Hollingsworth (In re Hollingsworth)*, 224 B.R. 822, 829 (Bankr.M.D.Fla. 1998). Because the evidence shows that Debtor transferred two vehicles owned by him within one year before filing his bankruptcy petition, only the fourth element is in dispute. Thus, the Court must consider whether Debtor made such transfers with the intent to hinder, delay, or defraud a creditor or the Chapter 7 trustee.

■ The intent element in section 727(a)(2)(A) is actual intent, rather than constructive intent. *Future Time, Inc. v. Yates*, 26 B.R. 1006, 1007 (M.D.Ga.), *aff'd*, 712 F.2d 1417 (11th Cir.1983). However, because the debtor is unlikely to admit his fraudulent intent, actual intent may be inferred from the actions of the debtor using circumstantial evidence. *Id.* at 1007–08. Factors which might evidence actual intent to defraud, often referred to as the "Badges of Fraud," include:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir.1989); *Harris v. Burrell (In re Burrell)*, 159 B.R. 365, 372 (Bankr.M.D.Ga.1993). These "badges" are the objective criteria that Bank may use to satisfy its initial burden of showing a basis for its objection. Bank has satisfied this

burden by showing that Debtor transferred both vehicles to his brother; he has convenient access to the Corvette and has used it regularly; he transferred both vehicles at a time when he was insolvent; he was aware he had defaulted on the loan from Bank when he transferred the Corvette; and he was aware Bank had filed suit to collect on that same loan when he transferred the Mazda. Therefore, the burden shifted to Debtor to satisfactorily explain his conduct. The Court must assess Debtor's actual intent in deciding whether or not section 727(a)(2)(A) has been satisfied.

Initially, Debtor contended that section 727(a)(2)(A) could not be satisfied by these transfers because Debtor had no equity in either vehicle, and thus no creditor was injured because the transfer did not reduce the assets available to creditors. The Court finds that this is not a valid defense in the Eleventh Circuit. In *Davis v. Davis (In re Davis)*, 911 F.2d 560, 561–62 (1990), the Eleventh Circuit rejected just such a defense. In *Davis*, the debtor transferred his one-half interest in his house to his wife so that it would not be subject to a judgment lien he expected as a result of having defaulted on a bank loan. This interest was later re-transferred to the debtor just before he filed bankruptcy. *Id.* at 560–61. The Eleventh Circuit recognized that there was no reduction in estate assets as a result of the transfer because the debtor regained his interest before the petition was filed. *Id.* at 561. However, the Eleventh Circuit affirmed the lower courts' denial of the debtor's discharge after concluding that a reduction in estate assets is not necessary to deny a debtor's discharge under section 727(a)(2)(A) if he made a transfer with the intent of defrauding his creditors. *Id.* 561–62 (citing *Future Time*, 26 B.R. at 1009). Thus, the outcome of this case depends on Debtor's actual intent in making the transfers, not the value of the transferred property.

With regard to the Corvette, Debtor testified that he sold the Corvette because he was no longer able to afford the monthly loan and insurance payments. Debtor says he chose to transfer the Corvette to his brother to ensure that he could satisfy Security Bank's lien on the Corvette with the proceeds from the sale rather than risk a distress sale by Security Bank for less than the amount owed thereby resulting in his liability for the deficiency. The Court found this testimony by Debtor to be both credible and reasonable.

Debtor was facing financial difficulties and knew he could no longer keep up with the payments on the Corvette. The Court heard expert testimony concerning the difficulties of trying to sell a Corvette convertible in the city of Albany, Georgia in the month of November. In addition, the evidence of the fair market value of the Corvette ranged below the amount Debtor still owed to Security Bank. Faced with the risk that he might lose the car and still owe a deficiency, Debtor chose the only alternative that seemed reasonable to him. Debtor's brother was willing to pay exactly what Debtor owed on the car thereby guaranteeing that he would be able to satisfy Security Bank's lien on the car and protect himself from a deficiency. Debtor's concern, although arguably convenient, was also reasonable. It does not appear that he was motivated by any intention to hinder, delay, or defraud a creditor.

As for the transfer of the 1992 Mazda pick-up truck, the Court is even less inclined to find any fraudulent motivation. Apart from the fact that Debtor sold the truck to his brother, Bank's main concern with the transfer is that Debtor sold the vehicle for $1,000.00 less than he valued it two weeks before on his financial statement submitted to Bank. Debtor testified that he was speculating when he valued the vehicle and that he sold it to his brother because his nephew was in need of transportation. There is no evidence that Debtor has sought to retain any beneficial

use of this vehicle at all. In addition, the Court heard no evidence as to the value of the Mazda at the time of the transfer. Debtor's financial statement valuation without other evidence does not, in this case, serve as a reliable measure for making a determination of fair market value.

In sum, while Debtor's conduct in these transfers resembles several so called badges of fraud indicating fraudulent intent, *Hollingsworth*, 224 B.R. at 830 ("retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer"), the Court finds, after having the opportunity to view the demeanor of Debtor and assess his credibility, that Debtor has satisfactorily explained his conduct. The Court is convinced on this question of fact that Debtor had no intent to hinder, delay, or defraud his creditors by the transfers. The Court will next consider whether Debtor's discharge should be denied pursuant to section 727(a)(4)(A).[3]

## II. *11 U.S.C. § 727(a)(4)(A)*

 Section 727(a)(4)(A) provides as follows:

> (a) The court shall grant the debtor a discharge, unless—(4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A). An omission from a debtor's schedules can constitute a false oath, *Hollingsworth*, 224 B.R. at 830, if such omission 1) was made knowingly and with fraudulent intent, and 2) was material to the bankruptcy case at issue, *see Chalik*, 748 F.2d at 618. As with section 727(a)(2)(A), fraudulent intent can be inferred from the "circumstances surrounding and observations of the debtor." *Hollingsworth*, 224 B.R. at 830. But the Court must find that the omission was deliberate. *Chalik*, 748 F.2d at 618. A

debtor will not lose his discharge due to an honest mistake. *See Ishkhanian*, 210 B.R. at 956. An omission is material if "it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik*, 748 F.2d at 618. The purpose of section 727(a)(4)(A) is to ensure the veracity of the bankrupt's statements which is essential to the administration of the Code. *Chalik*, 748 F.2d at 618.

 Bank presented a prima facie case as to its objection to Debtor's discharge under section 727(a)(4)(A). There are several items which Debtor did not disclose in his schedules. The burden shifted to Debtor to prove that the omissions were not made knowingly and fraudulently. The Court is persuaded that Debtor did not deliberately or fraudulently make omissions. As stated previously, the Court had the opportunity to observe Debtor, hear his explanation for each omission, and found Debtor's explanation to be credible.

It is unlikely that any debtor would recognize the need to list a vehicle he or she did not own in his or her schedules, no matter how often they drove it. Nor would a debtor be likely to think of listing expenditures he or she no longer makes (such as the contributions to his mother's household), contributions he or she does not regularly make (such as the contributions to his brother), accounts that are no longer owing (such as the Sears account), or accounts from which he or she receives no benefit (such as the Security Bank Farm Account). The Court heard no evidence suggesting that Debtor knew prepetition that he would recover his garnished wages. In addition, the Court heard only Bank's speculation that Debtor was entitled to a refund from the IRS in 1997. The Court was presented with no

---

**3.** Debtor's motive in the transfers was satisfactorily explained despite appearances to the contrary. Also, notwithstanding the Court's earlier assertion that proof of value trans-

ferred is not an element of required proof by plaintiff, *see supra* note 2, the lack of value transferred serves to corroborate debtor's explanation of his motives.

evidence contradicting Debtor's assertion that the $1,300.00 portion of the refund from the return of the engagement ring was deposited in his Security Bank accounts. The Court further accepts Debtor's assertion that he truly believed the amount showing in his check register for his Security Bank personal checking account was the true value of the account, rather than the amount showing on his bank statement which did not reflect those checks which had already been written but had not yet cleared the bank.

Debtor's payment for the cruise and his failure to list it as a regular expenses did not evidence any fraudulent intent. Debtor appears to have planned the cruise in advance. There is no indication that the $950.00 fund would have been available to creditors. Debtor could have easily dissipated that amount discretely if his intention had been to fraudulently deplete his assets. Further, Debtor's estimation in Schedule J that his recreational expenses were only $50.00 per month was an estimation of his current recreational expenses, which when filing bankruptcy are almost certainly reduced, and not a report of past expenses. The suggestion that the cruise expense should have been amortized as a component of Debtor's budget statement reflects the intensity of the scrutiny of Debtor's affairs in this case.

Finally, the Court is persuaded that Debtor honestly believed he had included his 5–Star checking and savings accounts in his schedules when he saw his 5–Star credit card account had been listed. The concealment of the former is not consistent with the disclosure of the latter. Furthermore, it is also important that the Court consider what the Debtor *did* disclose in his schedules when determining his intent. A review of Debtor's schedules reveals substantial disclosures which have proven to be largely reliable. He listed seventeen separate items of personal property, including six personal bank accounts, with a total market value of $66,470.00, and he listed eleven separate secured and unsecured debts. The Court is much more willing to believe that innocent omissions might occur when making a substantial disclosure than in a case where the debtor has fewer items to disclose and "mistakenly" omits one or two of those items. In addition, the Court notes that at least one item missing from Debtor's schedules was disclosed three months earlier in his Personal Financial Statement submitted to Bank. Such prior disclosure militates against an inference that Debtor sought to hide assets with the intent to defraud.

Certainly Debtor did not comply with his obligation of disclosure as fully as he could have, and many of his explanations evidence a degree of carelessness and irresponsibility. But Congress did not fashion a rule in section 727(a)(4)(A) that denies a debtor's discharge for such shortcomings. Rather, Congress sought to deny a debtor's discharge when the debtor deliberately omitted items from his schedules with the purposeful intent to defraud. After hearing the Debtor's explanations and considering the nature and substance of each of the many allegations, the Court is convinced that Debtor had no such intent. Therefore, Debtor's discharge will not be denied.

An order in accordance with this opinion will be entered on this date.

### ORDER

In accordance with the memorandum opinion entered on this date, it is hereby

ORDERED that Bank of Dawson's objection to Dexter Jerome Cutts's discharge is DENIED.